CASE 62—INDICTMENT—MARCH 8.

# Omer v. Commonwealth.

APPEAL FROM UNION CIRCUIT COURT.

95   353
e123  188
123   477

95   353
132   678

1. HOMICIDE—AIDERS AND ABETTORS.—As it appeared upon the trial of appellant for murder that he said nothing and did nothing at the time of the killing, the case against him rests on the intent with which he was present, as he is guilty of murder only in the event his companions were so guilty and he was present in pursuance of a mutual understanding to carry out some unlawful purpose. Therefore, it was error to give an instruction which authorized the jury to acquit only in the event some one of the appellant's companions fired upon the party of the deceased without the "knowledge or assent" of the appellant, as the "knowledge" imputed in the instruction is the knowledge of the firing at the time it occurred, the hypothesis upon which the instruction was based precluding the idea that a previous knowledge was meant.

2. CONSPIRACY—EVIDENCE.—Although a conspiracy between appellant and his co-defendants was charged the court properly refused to allow him to prove the good character of his co-defendants.

3. SAME.—The court did not err in refusing to allow the alleged co-conspirators to testify in behalf of appellant.

4. SAME.—The deceased being one of the party which had abducted a friend of the defendant's, testimony to the effect that some one in the excited crowd that gathered just after the abduction cried out, "Go for William Omer" (the appellant), was incompetent and prejudicial, neither appellant nor any of his co-defendants being present at the time.

5. SAME.—The abduction being made for the purpose of forcing the person abducted to marry the deceased, what was said and done on the occasion of the attempt to consummate the marriage was not competent evidence, neither the appellant nor any of his co-defendants being present.

6. INSTRUCTION AS TO MURDER—PREJUDICIAL ERROR.—The failure of the court, in instructing the jury as to murder, to require them to find that the killing was "feloniously" done in order to convict of that offense, was not prejudicial error in this case.

P. B. MILLER AND YEAMAN & LOCKETT FOR APPELLANT.

1. If illegal evidence prejudicial to the accused has been admitted over his objection, this court will not speculate as to its effect on the jury, but reverse the case and order a new trial. (Coppage v. Commonwealth, 3 Bush, 533; Kennedy v. Commonwealth, 14 Bush, 361 McGraw v. Commonwealth, 14 Ky. Law Rep., 344-5.)

2. The explanations of bystanders in the absence of the accused were not

competent evidence against him.   (Bradshaw v. Commonwealth, 10
Bush, 576; Werner v. Commonwealth, 80 Ky., 376.)

3. The testimony of Judge Flournoy as to the conversation between Henry
Delaney and Abbie Oliver was improperly admitted.

4. No declaration of a conspirator made after the conspiracy is ended by
its failure or success can be used against a co-conspirator. (1 Greenleaf
on Evidence, sec. 111; 3 Greenleaf, sec. 94; 2 Bishop on Crim. Proc.,
sec. 191; Logan v. United States, 144 U. S., 308-9; 78 Ky., 15;
Shelby v. Commonwealth, 91 Ky., 569; Encyclopedia of Law, vol. 4,
632-3.)

5. It was competent for appellant to prove the good character of his
alleged co-conspirators.   (4 Am. and Eng. Ency. of Law, p. 632.)

6. The jury should have been required to find, in order to convict, that
the killing was *feloniously* done.   (Kaelin v. Commonwealth, 84 Ky.,
354; Hamilton v. Commonwealth, 5 Ky. Law. Rep., 929.)

7. It was the duty of the court, with or without request from defendant, to
give the whole law of the case.   (Blinim v. Commonwealth, 7 Bush,
327; Brady v. Commonwealth, 11 Bush, 288-9.)

8. The agreement of the parties to go to Morganfield armed as they were
to interpose and protect Henry Delaney by whatever force might
become necessary was not a conspiracy.   (4 Am. and Eng. Ency. of
Law, p. 583; 2 Bishop on Crim. Law, sec. 149, third ed.; 3 Greenleaf
on Evidence, sec. 89.)

9. The evidence was such as to authorize instructions both as to man-
slaughter and self-defense.

10. Instruction 5 was erroneous, because under it the jury could not acquit
if the defendant either consented to or knew of the shooting, which is
not the law.   (True v. Commonwealth, 90 Ky., 653.)

11. The court should have instructed the jury, as requested by appellant,
that if Henry Delaney was, by force, taken with the intent to force
him to marry Abbie Oliver, or kill him, his friends, if they had rea-
sonable grounds to believe he would be forced to marry her or be
killed, had the right to arm themselves and follow for the purpose of
defending him, and if some of the others killed her the defendant was
not guilty.   (Campbell v. Commonwealth, 88 Ky., 408.)

WM. J. HENDRICK, Attorney-General, for appellee.

1. The fact that the parties indicted were frequently seen together for
some weeks prior to the indictment was competent evidence, being a
circumstance tending to show a conspiracy.

2. While the court will not *speculate* upon the effect of evidence, it will
not reverse because of the admission of evidence that plainly does
not bear upon the issue, and could not have influenced the verdict.

3. Evidence of the good character of the appellant's co-defendants was not
competent.

4. When persons combine to do an unlawful thing, if the act of one, pro-

ceeding according to the common plan, terminates in a criminal result, though not the particular result meant, all are liable. (1 Bishop on Criminal Law, secs. 636, 641.)

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

In the village of Sturgis, in Union County, at about ten o'clock at night, on the 4th day of April, 1893, Taylor Oliver and his wife, each well armed, entered the place of business of Henry Delaney, and demanded that he go at once with them and marry their daughter, Abbie, whose ruin, they charged, he had accomplished. He denied the charge, but upon being threatened with instant death he gave up his pistol and proceeded with the Olivers to a surrey a short distance away, in which the daughter was waiting. During this time some three or four shots were fired by the Olivers. The parties at once drove to Morganfield, some twelve miles away, where the county clerk was aroused and a marriage license procured. The county judge, found some two miles distant, was awakened and asked to marry the couple, but upon Delaney detailing the circumstances of his capture and his unwillingness to marry the girl, the officer refused to perform the ceremony. Quite a scene ensued, and the prisoner was told that he would be given one more chance, but that if he made any objection to the next officer approached, they would instantly kill him. A minister was then found, who performed the rites while the parties remained in the carriage. They then started back, and upon reaching the Tur hill, some two miles from Morganfield, at about two o'clock in the morning of the 5th, they were met by a party of Delaney's friends, when a sudden firing began, in which Abbie Oliver was killed and her father severely shot in the arm and face.

At the July term of the Union Circuit Court the appellant and some eight others were jointly indicted for the murder of the girl, and, upon the trial of the accused at the November term, he was found guilty, and his punishment fixed at confinement in the penitentiary for life. Upon this appeal he insists that certain instructions given the jury were misleading and otherwise prejudicial to him; that much testimony for the State which was incompetent was admitted, and some excluded which was competent.

For the purposes now at hand, it will be necessary only to review briefly the appellant's connection with this tragedy. He appears to have been entirely friendly with the Olivers, and was a friend of young Henry Delaney, and prior to the night of the latter's capture was seen with him and other friends at various times. On that night he was engaged in doctoring a sick horse, and went to the drug store at which Delaney was employed for medicine. He there learned of the kidnaping, and after a consultation with other friends it was decided not to apprise the relatives of young Delaney of the occurrence, but upon reflection, and after leaving the excited crowd, the accused and Tate agreed that they ought to let Holt, the brother-in-law of Delaney, know of his peril. They walked over to Holt's, about a mile out of town, and told him of the trouble. It was then agreed that George Delaney, Henry's brother, should know the facts. In a short while some eight or ten of the neighbors and friends of Henry Delaney, including the accused, the relatives named and others, gathered at the village, and it was agreed that they would go over to Morganfield to find

out what had become of the parties.  At this point the
accused thus testifies :

"They were my neighbors, and I thought I would go
with them to Morganfield, get breakfast, see what they
had done with Henry Delaney, and get back by dinner.
We started to Morganfield; I didn't see Holt and Thom-
ason until I got to Elijah Hughes'.  We didn't think that
they could go to Morganfield and be married that night,
as it was twelve miles to that place and late at night when
they left Sturgis.  Tate and I rode together and were
behind all the parties, until Thomason got out of the
buggy at the Young hill, when we rode past them.  I
did not expect to meet the Olivers on the road.  Frank
Holt and Louis Land were in front, and George Delaney
and Carter next.  Tate and I were some distance behind.
Just as Tate and I got to the top of the Tur hill I saw the
surrey coming, meeting us at the foot of the hill.  George
Delaney, Land, Frank Holt and Carter were some distance
in front of us, and as they met the surrey I heard a pistol-
shot.  Don't know who fired it.  The second shot was over
the horses, came from right to left across the surrey, and
was a pistol-shot.  I was some forty or forty-five yards
behind, and couldn't tell who fired it, but think it was
fired from the surrey; some seven or eight other shots
were then fired.  I had a thirty-two caliber pistol, but
never fired it that night," etc.

Taylor Oliver, as to the occurrences at the hill, testified
as follows : "When about one-half way up Tur hill,
two miles from Morganfield, four men rode up on horse-
back, and Frank Holt said, 'Hold up,' or 'Hold on, there,'
and immediately began firing.  Some fourteen or sixteen
shots in all were fired.  Frank Holt and another went on

the right, and George Henry and George Delaney on the left side of the surrey. I was shot first in the arm with a shotgun by Frank Holt. As I turned my head to look behind me I was shot in the right jaw by a thirty-two caliber pistol. I don't know who shot me in the face," etc.

Mrs. Oliver testified thus as to the meeting: "At the Tur hill, about half-way up, I was driving, when four men abreast met us, two going on each side. I was on the left side and Abbie immediately behind me. George Henry and George Delaney were the men on my side. Some one said, 'Hold up, there,' and immediately the firing began. George Henry shot at me with a pistol and George Delaney rode behind and shot Abbie. He was right at the surrey. He rode a gray horse. Positive that both George Delaney and George Henry were there. Knew them both well," etc.

This was the whole of the testimony introduced on the trial as to the details of the killing. The accused, however, offered to prove by Tate and George Delaney that he was some forty or fifty yards from the surrey when the shooting occurred, and that he did not shoot or incite or encourage any one else to do so, and that Carter, Land, George Delaney and Holt were all in front of Tate and the accused when the firing commenced. This proof the court rejected upon the ground that a conspiracy had been made out against the accused and the witnesses offering to testify.

It can not be contended from the proof that the accused either killed the deceased or wounded her father, or, indeed, took any part in the shooting. His crime, if he committed any, must consist in his being on the ground,

and by his presence aiding, encouraging or inciting others to kill the Olivers or do them bodily harm. And this is only possible if he were there in pursuance of an agreement to commit some unlawful act. The testimony is clear enough, indeed, is uncontradicted, that he said nothing and did nothing at the time of the immediate killing. Nevertheless, if by his presence he gave aid or encouragement to the others engaged in the fight, he is guilty of murder, if they were so guilty, provided he was there in pursuance of a mutual understanding to carry out some unlawful purpose. His presence alone, without such an understanding, does not make him responsible for the acts of the others. Therefore, the case against him rests on the *intent* with which he was present, to be gathered from the proof and all the circumstances shown in the case.

In this connection we notice the instruction most seriously complained of, as it bears directly on this vital issue.

"If the jury believe from the evidence that the defendant, Omer, had no understanding with any of the parties named that if overtaken or met the Olivers, or some of them, were to be assaulted with weapons or otherwise mistreated, and did not know of such understanding among any of the others, and had no such purpose on his own part, but was going to release, or cause to be released, Henry Delaney, in a peaceable and lawful way, *when some one of said parties, without the knowledge or assent of the defendant, Omer*, fired upon the Olivers and killed Abbie Oliver, they will find him not guilty as charged."

Here the defendant, although assumed to be on a lawful mission and bent on the use of peaceable means only, having no notice or knowledge of a different intent on the part of others, is to be acquitted only in the event

that the deceased was shot and killed by some one of the accompanying party *without his knowledge or consent.* Necessarily, the jury understood from this, and were in effect told, that if she were fired upon and killed by some one other than defendant, *with* the defendant's knowledge or consent, the defendant was guilty.

This instruction was absolutely fatal to his defense. It would avail him nothing to show that he was along for a lawful purpose, or intended no harm to any one, or did not encourage or incite any one to do an unlawful thing, if he was to be held responsible for the firing upon the Olivers simply because he had *knowledge of such firing.*

It can not be said that the knowledge attributable to the accused, in the meaning of the instruction, was previous knowledge of the assault to be made with weapons, or knowledge that the Olivers were to be fired on when met or overtaken, because the instruction expressly excludes this, and is based on the hypothesis that the defendant had no knowledge or understanding in advance that the Olivers were to be fired on. The knowledge imputed in the instruction, therefore, is the *knowledge of the firing* at the time it occurred.

In the late case of True v. Commonwealth, 90 Ky., 651, the words "approve of" and "consent to" were condemned as not suitably expressing the idea of aiding and abetting. The instruction was: "If they believe from the evidence that Samuel Sellars shot and killed Robertson, they should acquit the defendant, True, unless they believe from the evidence, beyond a reasonable doubt, that the defendant, True, at the time of said shooting and killing, was present and did, in some manifest manner, encourage, incite, *approve of,* or aid or *consent to* said shooting of

said Robertson," etc.     The words "encourage, aid or abet" and "counsel, advise or assist" were said to be words in appropriate use "to describe the offense of a person who, not actually doing the felonious act, by his will contributes to or procures it done, and thereby becomes a principal or accessory," etc.     "But," say the court, "the words ' approve of' and ' consent to ' do not, singly or combined, express the idea of willful contribution to or procurement of a felonious act, which is necessary to constitute guilt."

We conclude, therefore, that not only was the use of the word "knowledge" in the instruction under consideration erroneous and misleading, but likewise the word "assent," the distinction between the use of the words "assent" and "consent" being substantially imperceptible in this connection.

We perceive no other serious objection to the instructions, although the failure to use the word "feloniously" in the first instruction should be cured upon another trial. We are inclined to think that, owing to the peculiar nature of the facts set up by way of defense, that the failure to use these ordinarily necessary words was not prejudicial, but the omission should be supplied in the future.

It seems to us that the testimony of Ouan that some one in the excited crowd, which had gathered about the drugstore just after the abduction of Henry Delaney, cried out, " Go for William Omer," was clearly incompetent. The witness proving this also proves that neither Omer nor any of his co-defendants were present.     If the issue had been merely whether or not Omer had gone with the parties toward Morganfield, the proof would not have been misleading, or even material, because he in fact did

go, but the issue was, whether there was a conspiracy or mutual understanding, and we can see at once how the use of these words, right at the inception of the undertaking, or in advance of the coming together of the parties who made the trip, would indicate or strongly intimate to the jury that Omer was the master spirit or ringleader of the enterprise, and who, upon the first appearance of danger, was to be sent for and consulted. He is shown by the Commonwealth not to have been present, nor were any of the alleged conspirators present when this declaration was made. In no aspect of the case therefore can it be held competent against the defendant.

We might not say that the graphic description of the exciting scene before the county judge, or the occurrence of the attempt to consummate the marriage, was so prejudicial as to require a reversal of the case, but the accused was not present, nor were any of the parties there for whose acts or words he is sought to be made responsible. What was said there was calculated to arouse the passions and inflame the minds of the jury, and should be excluded on any future trial.

The appellant contends that he should have been permitted not only to establish his own good character among the people of the community—as he did do—but also the good character of each of the parties indicted with him. At first blush it might seem plausible that, as it was sought to make the accused responsible for the acts of these parties, he should be permitted to show their good character, as rebutting the idea of conspiring with such men; but the accused alone was on trial, and his own conduct and character were involved. The rule would have to work both ways, and a good man caught,

ever so innocently, in bad company might be made to suffer from the establishment of such a rule, or if presumptions of guilt or innocence might be indulged in according as the party charged was in good or bad company.

We are not inclined to disturb the ruling of the lower court in refusing to allow the alleged co-conspirators to testify. For obvious reasons we shall not discuss the testimony on this point. The proof may be presented in an entirely different aspect on another trial, and we do not intimate what should be done under circumstances differing from those now before us.

For the reasons indicated the judgment is *reversed*, and a new trial is awarded to be had upon principles consistent herewith.