## Powers v. Commonwealth.

(Decided October 27, 1922.)

### Appeal from Kenton Circuit Court.

1. Homicide—Aiders and Abettors—Conspiracy to Commit Robbery. —Where two or more persons unite and agree to commit robbery, each of them is responsible for what another does in furtherance of the common purpose and design, or what he may do in order to.

prevent discovery or to effect escape, and if one of them commits murder under the named conditions the others who were present may be convicted as aiders and abetters; but not so, if the killing was not done under the named conditions and independently thereof and as an individual act of the particular perpetrator.

2. Criminal Law—Conspiracy—Instructions—Aiders and Abetters.— It may be competent for the court to give a conspiracy instruction, if the evidence authorizes it, although the indictment contains no such charge; but defendant who was convicted under an instruction which authorized it if he was the actual perpetrator of the crime, or was present, aiding and abetting when another committed it, can not complain at the refusal of the court to give an instruction on conspiracy, since the failure to do so was an error against the Commonwealth and was in reality beneficial to the defendant, for without the instruction the jury was deprived of one theory upon which a conviction might be had.

3. Homicide—Attempt to Commit Robbery—Instructions.—The rule of criminal practice that the whole law of the case should be given where there were no eye-witnesses to the commission of the crime, and circumstances and facts appeared indicating a struggle or the possibility of the crime being manslaughter, or homicide committed under the right of self-defense, has no application to an indictment for murder where the killing occurred in an attempt to rob and there were eye-witnesses to the robbery, although no one saw or testified to who actually fired the shot resulting in the killing.

4. Homicide—Voluntary Manslaughter—Robbery.—The doctrine that one may be guilty of voluntary manslaughter if he unintentionally kills another while engaged in an unlawful act has no application to a case where the killing was intentional and was done, either to aid in the perpetration of a robbery in which defendant was engaged, or for the purpose of preventing discovery or effecting escape.

5. Criminal Law—Rendering Incompetent Evidence Competent.—It is not allowed to a defendant by his own wrongful and criminal acts to render otherwise competent evidence incompetent, and he can not complain of contradicting evidence as to where he was and who were his associates on certain designated occasions because on those occasions he and his associates, who were also his co-defendants, were engaged in the commission of robberies, and when the court confined the evidence to the presence of defendant and his associates at the designated places and excluded any evidence as to their purpose and conduct while there.

JOHN T. MURPHY, MARTIN J. BROWN and STEPHENS L. BLAKELEY for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and ORIE S. WARE, Commonwealth Attorney, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Appellant, James Powers, was tried in the Kenton circuit court on an indictment returned by the grand jury of that county accusing him of the crime of wilfully murdering Morris Lee by shooting and killing the deceased with a pistol, or that Isaiah McKnight or George Sanders in the same manner murdered the deceased and that appellant was present at the time and did wilfully, maliciously and with his malice aforethought assist, aid and abet the perpetrator of the crime in the commission of it. He was convicted and the death sentence imposed. His motion for a new trial was overruled and he has appealed, insisting upon a number of alleged errors which will be disposed of in the course of this opinion.

Before considering them seriatim, we deem it appropriate at this point to briefly refer to the facts leading up to and attending the shooting which are so completely, succinctly and fairly stated in brief for the Commonwealth that we have concluded to incorporate it herein and it is in these words: "Appellant, James Powers, and one Isaiah McKnight, who made a full and complete statement when arrested, met on Sunday evening about six o'clock, January 22, 1922, on Third street near Madison avenue, in the city of Covington, and proceeded to a point near Seventeenth and May streets in said city, where they secured an automobile, and then the two went to 905 Nassau street, Cincinnati, where they picked up George Sanders and Ray Rogers. These four proceeded in their automobile, McKnight driving, from Cincinnati, through Newport and Covington, and back to Cincinnati; then they ran to Hamilton, Ohio, and remained there but a few minutes, and then returned through Cincinnati to Covington, crossing the C. & O. bridge into Covington, at the foot of Main street, and went immediately to the southeast corner of Pike and Russell streets, arriving at this place between 10 and 10:45 o'clock p. m. on the same evening, January 22, 1922. They parked their machine on the east side of Russell street, facing northwardly, near the corner, and south of Pike street. The machine was so parked that those sitting in the machine could see the front of the Strand Theatre, a moving picture house owned by Harry Lee, and operated by him and his son, Morris Lee. About 11 o'clock Harry Lee and his wife, Jennie Lee, Morris Lee, a son, and Ruth Lee, a daughter, came out of the theatre and got into the Lee machine,

which was parked in front of the theatre. They moved westwardly on Pike street and turned around, and then went eastwardly to Madison; thence southwardly one block to Seventh; thence eastwardly three blocks to Garrard, thence northwardly to the Lee home at 618 Garrard street. As soon as the Lee car moved away from Pike and Russell, Powers, McKnight, Sanders and Rogers followed them in their machine, and came up behind the Lee car, when it stopped on the east side of Garrard street between Sixth and Seventh, and then the bandit car moved on northwardly to the left of the Lee car, stopping alongside the Lee car with the hood of the bandit car standing about three feet further north than the Lee car. When both cars were stopped they were standing alongside each other, and the front of the bandit car was setting at an angle and further northwardly than the Lee car. When the Lee car stopped, Mr. Lee got out of the right side of the front seat, leaving his son, Morris Lee, who had been driving the machine, sitting in the machine at the wheel with his engine running. Mrs. Lee and her daughter had also gotten out of the machine at the same time. This was a cold night, and the streets were somewhat covered with ice. The father proceeded to the side door of the home to get a dog, which they usually took with them to the garage, and Morris Lee remained at the wheel with his engine running, waiting for his father. Just as the bandit car stopped on the opposite side of the machine, from which the Lees had alighted, according to the testimony, Sanders alighted from the front seat and Powers from the rear seat of this car, and, before any one was seen by Mrs. Lee, a shot was heard. Immediately following the shot, someone came to the sidewalk from behind the cars and held a pistol in front of Mrs. Lee, who screamed and ran down the sidewalk some distance to the front of the Caldwell home, where some people came to the window, and at this point Powers, who was identified by Mrs. Lee as the man following her, jumped into the bandit car and it drove away.'' Deceased was discovered with a shot through his head and it was resting on the driving wheel.''

That statement is fully borne out by the evidence heard on the trial, and the only substantial qualification that may be stated is that Powers and Sanders testified that the latter got out of the automobile at some point in Covington after the return trip from Hamilton, Ohio, and that he was not at or near the theatre, nor was he present

at the time of the attempted robbery, which testimony on their part is flatly contradicted by McKnight and Rogers, and by other facts and circumstances proven in the case, all of which thoroughly convinces us that their testimony is correct and that Sanders was present from the time the quartet got into the automobile in the early part of the evening until it was abandoned on Isabella street in Covington after a circuitous drive following the killing, and near 12 o'clock at night. The evidence shows that all four of the accused remained in hiding from two weeks to near a month after the killing, some of them a portion of the time in Cincinnati, Ohio, and some of them at different places in Covington, Kentucky; but we will not encumber this opinion with a detailed statement of what the evidence showed with reference thereto. It was furthermore shown by McKnight and Rogers, both of whom testified for the Commonwealth, that the purpose of the parties from practically the beginning of their coming together was to commit robbery, but whether they intended the particular one attempted until the stop on the east side of Russell street near its junction with Pike street and in view of the Strand Theatre, which was operated by the father of the deceased, does not clearly appear. It was conclusively proven, however, that there was formulated a common design and purpose to rob that theatre or the persons operating it, after the stop was made, as soon as it closed for the night and when a favorable opportunity presented itself. Powers in his testimony admitted the common purpose to commit the robbery, but he denied that either he or Sanders got out of the automobile in front of the Lee residence and said that Rogers and McKnight, the latter of whom was driving the bandit car, were the ones who got out of it and that the latter admitted after the shooting and before they abandoned the car that he was the one who perpetrated the crime, which is denied by McKnight and Rogers, both of whom stated that Powers and Sanders were the ones who got out of it and that one or the other of them immediately did the shooting and that when it was ascertained that the robbery was about to be frustrated they got back into the car and the four immediately drove away.

It will be seen that Mrs. Lee positively identified appellant as the one who came around her car upon the sidewalk with a pistol in his hand, and her daughter corroborated her to the extent that some one of the four did

so present himself with a pistol, but because of the witness's position and, perhaps, insufficient light, she was unable to identify appellant as the one who did so. Appellant denied that he had a pistol on that occasion, but said he owned one which was in his room, and other testimony conclusively proved that he had it with him on that trip. He also testified that prior to that time, and since about the middle of December, he had been sick and was confined to his room, which was located at a named place, and that he had not been out or stirring around to any extent for that period of time, nor had he been with any of his confederates during that time and that he had not during that time ridden with them or any one else to any place in an automobile.

There was no conspiracy charge in the indictment, either to commit murder or to commit robbery, or, the further one that in carrying it out the deceased was killed in furtherance of the common design, and the court only submitted to the jury in an appropriate instruction the issues (a), whether appellant himself did the killing in the manner necessary to constitute murder, or (b), whether McKnight or Sanders did the killing in the same manner and appellant was present, counselled, aided, advised and abetted the perpetrator in the commission of it. No instruction on voluntary manslaughter or self-defense was given and it is strenuously argued that the court committed grievous error in not giving the manslaughter instruction, and in failing to give one on conspiracy to commit the robbery and that the killing was necessary in carrying it out, or to aid the parties in preventing discovery or in effecting their escape, or both.

Just in this connection we might pause long enough to notice the objection that the evidence is insufficient to show that the killing was the natural result of carrying out the common design of the parties, or that it was necessary in carrying it out to effect escape or to prevent discovery. A number of authorities are cited from foreign courts to the effect that one may not be guilty of an independent crime committed by a confederate, unless its commission "necessarily took place in execution of the common design either to promote the execution of the common design or to prevent discovery or escape." In other words, it is insisted that the particular crime committed by an associate or confederate, and for which defendant is on trial, in order to establish his guilt, "must have been shown to have been done for the furtherance,

or in the prosecution of the common object and design for
which they combined together,'' and that where the par-
ticular crime committed by the associate or confederate
was independently of and totally disconnected with the
common purpose and design and not necessary to its ac-
complishment or to prevent the discovery or escape of the
parties, only the perpetrator is guilty and that none of his
associates may be charged therewith.'' We heartily sub-
scribe to the soundness of that contention, but the facts
of this case do not bring it within the doctrine, since it is
glaringly apparent that the killing of Morris Lee, if not
done to render the robbery more easy of accomplishment,
by removing him as an obstructor and by terrorizing the
victims, it was certainly done to aid in preventing dis-
covery and in effecting escape; for the testimony is be-
yond dispute that he was sitting at the wheel of the au-
tomobile he was driving with its engine running, under
which circumstances he could immediately pursue the
fleeing robbers, if indeed he could not assist in prevent-
ing the robbery. It is manifest, therefore, that the act of
killing him was done in furtherance of the common pur-
pose and design within the thoroughly established rule
relied on. The facts of no two cases are precisely alike,
but those found in the case of Anderson v. Common-
wealth, 144 Ky. 215, are so analogous to those contained in
this record that we are convinced that the principles an-
nounced in that opinion apply here and furnish a com-
plete answer to the criticism now under consideration.

But it is insisted that although there was no conspir-
acy charge in the indictment yet it was the duty of the
court to give an instruction on conspiracy to commit the
robbery and that the killing of the decedent was neces-
sary in order to carry it out, or to prevent discovery or
escape, and the case of Dorsey v. Commonwealth, 13 Ky.
L. R. 359, is relied on for this contention. That case holds
that where there is evidence to prove a conspiracy an in-
struction based thereon may be given, although there is
no such charge in the indictment, and the giving of such
instruction under the circumstances was one of the al-
leged errors relied on by the accused in that case. The
court decided the point against him and upheld the action
of the trial court in giving the instruction. The judg-
ment, however, was reversed, but for other and different
reasons. As in that case this court sustained the action
of the trial court in giving the instruction, so might we
sustain the giving of one in this case, if the court had

given it, provided it was correctly drawn. The question, however, for determination is, whether the failure to give it was detrimental and prejudicial to appellant's substantial rights. It is so plain to our minds from every reasonable or logical standpoint that the only one prejudiced by the failure of the court to give the instruction in this case was the Commonwealth that we deem but little discussion necessary. If the *failure* to give the instruction was *beneficial* to appellant he most certainly can not complain, and that it *was* so is perfectly manifest. Without it the jury could not convict him, unless it believed beyond a reasonable doubt that he murderously did the shooting, or that some one of his confederates in like manner did it and he was present, assisting, aiding and abetting the act. If the instruction *had been given* the jury could then have convicted him if it had believed beyond a reasonable doubt that the conspiracy had been formed and that the killing, though done by another, occurred as a necessary consequence in carrying it out, or in order to prevent discovery or to effect escape, although appellant may not have been present, or actually assisting, aiding and abetting in the commission of the crime. So that, the failure to give the instruction relieved appellant of conviction under one possible theory of the case as presented by the evidence introduced, and it is not allowed to him the right to complain of the failure of the court to give the instruction when such failure was an error committed *against* the Commonwealth and *in* his favor.

It is next insisted that the court erred in not giving an instruction on voluntary manslaughter, and we must acknowledge that we are a little confused as to the grounds upon which this contention is based. The best we can gather from the argument of counsel is, that in as much as no one saw the actual firing of the shot that killed the deceased, the case should be governed by the principles announced in the cases of Rutherford v. Commonwealth, 13 Bush 608; Ratchford v. Commonwealth, 16 Ky. L. R. 411; Messer v. Commonwealth, 28 Ky. L. R. 920; Bast v. Commonwealth, 124 Ky. 747; Frasure v. Commonwealth, 169 Ky. 620; Ratliff v. Commonwealth, 182 Ky. 256, and Bowlin v. Commonwealth, 195 Ky. 600. In those cases it was announced that where there were no eye-witnesses to the perpetration of the crime, and local conditions or other facts appear-

ing in the case indicate that a struggle may have occurred, or anything else appearing from which it might be concluded that the killing happened in some other way than as the result of murder, it would be the duty of the court to instruct upon the whole law of the case, including, of course, the giving of one on voluntary manslaughter. We have no such conditions here, and the facts upon which those opinions are rested are so far removed from those presented by this record that we feel it unnecessary to pursue the question further.

But counsel in brief offer the further suggestion that, in as much as the killing of the deceased was not originally intended but may have been the result of the attempted robbery, which was an unlawful act, the case comes within the well known principle that if one, while engaged in an unlawful act, kills another, which latter act was not intended, he is guilty of voluntary manslaughter and for that reason such an instruction should have been given in this case. What we have heretofore said disposes of this contention, but it might be further added that the doctrine contended for, when applicable at all, prevails only where the killing, as the result of the unlawful act, and which would thereby reduce it to voluntary manslaughter, was wholly unintentional and was the result of some mistake and at a time when the perpetrator did not intend to either wound or kill. It has no application where the wounding and killing were designed and intended. We can, therefore, find no room for a manslaughter instruction under the facts of this case.

Lastly, it is contended that the court erred in the admission of certain evidence offered by the Commonwealth. As we have heretofore remarked, defendant claimed that he was sick for some weeks before the commission of the crime for which he was convicted and that during that time he was not associated with any of his confederates, nor did he drive with them or any one else in an automobile. In rebuttal the Commonwealth introduced witnesses to prove that on some four or five occasions, extending up to the day before the killing of Lee, the appellant, sometimes with part of his confederates and at others with all of them, was at places at night in the city of Covington, Kentucky, and in Cincinnati, Ohio, and that they were driving the same machine that they were in when Morris Lee was killed. The court did not permit the witnesses to say what appellants and his associates were doing on these occasions, but one witness,

when asked, "How did they come," answered, "They rushed in with pistols." Of course, the purpose of the question was to elicit the mode of travel of appellant and his associates, i. e., whether they came to the place in an automobile or otherwise; but the witness misunderstood the question and answered as indicated, whereupon the court excluded the answer and admonished the jury not to consider it. The basis of the complaint of that character of testimony is that on each of the occasions inquired about the places visited were robbed by the appellant and his associates, two of which occurred on the night of January 14, preceding the killing on the 22nd, and the last of which occurred on the night of January 21, the day before. It is insisted that the testimony was highly prejudicial because it tended to poison the minds of the jury who had a general newspaper knowledge of the commission of those crimes. In the first place, it might be seriously doubted whether the evidence would have been incompetent if it had been expressly proven that appellant and his associates committed robbery upon each of those occasions, since such testimony would tend to prove a systematic plan of criminal action on the part of the defendants in the indictment. Bullington v. Commonwealth, 193 Ky. 529; Moore v. Commonwealth, 188 Ky. 505; Music v. Commonwealth, 186 Ky. 45; Clary v. Commonwealth, 163 Ky. 84. But whether so or not (and we do not determine the question), the Commonwealth had the undoubted right to contradict appellant by showing that his testimony as to his conduct and whereabouts preceding the commission of the crime for which he was on trial was false, and that, instead of being sick and confined to his room and that he had not ridden in an automobile with any of his associates, as he testified, he was regularly engaged throughout that time in promiscuously driving around with them in the same automobile; and it would be an anomaly in the law that such universally recognized competent testimony could be rendered *incompetent* by the appellant's criminal conduct in perpetrating robberies at the several places where he was proven to be. Counsel for appellant admits that the testimony was competent but for the fact that the places where defendant was proven to be were robbed on the respective occasions. The law will not allow the accused the privilege of eliminating such competent testimony from the case by his own wrongful acts, and we are con-

vinced that no error was committed in the admission of the complained of testimony.

The gravity of the punishment in this case is such as to demand of us the most painstaking care and attention in its consideration, all of which we have endeavored to give to it, and have been unable to find any error committed at the trial, much less one that, in the least, could be considered prejudicial to appellant's substantial rights. This case and its facts are so similar to those in the case of Lawler v. Commonwealth, 182 Ky. 185, that we deem it not inappropriate to insert herein this excerpt from that opinion: "The defendant had the course of a useful, upright life before him. He did not choose to follow it, but rather to travel the devious path that leads to destruction. He has been shown to be guilty of a most atrocious murder, prompted by no other motive than robbery. The legislature, in providing for the death penalty for the crime of murder, realized that there were cases of sufficient magnitude to deserve the punishment of death. If there be such this case comes within that class. We must administer the law as we find it, and if one constructs for himself a bed of thorns, he has no one to censure but himself. We think there can be no doubt of defendant's guilt, and being the sole author of his condition, he must suffer the consequences, since we cannot find anything in the record to authorize our interference."

Wherefore the judgment is affirmed, the whole court sitting.