## Warren v. Commonwealth.

(Decided November 15, 1927.)

## Appeal from Franklin Circuit Court.

1. Homicide.—In prosecution for murder growing out of a fight, defendant, though admittedly starting fight, but using no deadly weapon, and without any intention to bring about killing, or without knowledge that any of others participating with him in fight had any such intention, could not be said to be "aiding and abetting" in commission of felony.

2. Homicide.—In prosecution for murder growing out of fight, instruction to acquit if defendant was unconscious as result of blow given him by some one before beginning of fight, and that he took no part in fight before fatal blow was struck, or, if after fight began, and before fatal blow was struck, he was rendered unconscious, or if he in good faith withdrew from difficulty before fatal blow, was justified by evidence, and should have been given for defendant.

3. Criminal Law.—In prosecution for murder, evidence showing defendant had been convicted of a misdemeanor and confined in prison held incompetent.

FRANKLIN, TALBOT & CHAPMAN and W. E. DARRAGH for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

This case arises out of the same happenings as the case of Lee v. Commonwealth, 210 Ky. 411, 276 S. W. 127, 218 S. W. 360, and Warford v. Commonwealth, 213 Ky. 675, 281 S. W. 819.

The brief for the appellee shows that the writer thereof was intimately acquainted with the facts in the case, and we are substantially adopting his statement of facts as the correct statement. At about 8:15 p. m., on Sunday June 15, 1924, Ed Morrow, a young man about 24 years of age, at the conclusion of a fight engaged in by

seven or eight young men, was found in a dying condition on the north sidewalk on Wapping street near the second window from St. Clair street of what was then known as the Ragged Robin Restaurant, which place corners on St. Clair and Wapping, and runs lengthwise with Wapping street. Morrow died soon after receiving a knife thrust into the upper portion of his heart. He uttered no word before his death. At the September term of the Franklin circuit court the appellant, Warren, was jointly indicted with Edgar Lee, Neville Warford, and Bryan Glass, the indictment charging them with the murder of Ed. Morrow, and in separate counts charging each with the murder, and the others with aiding and abetting therein.

The proof in this case disclosed that on the morning of the tragedy the four young men who were charged with the murder, according to their admissions in their testimony, met in the basement of the Capital Hotel in a barber shop where they had their shoes shined. Others were there with them, and the assembled crowd drank a half pint of whisky. They spent an hour or more in the barber shop, when they separated. Later in the day Lee and Warford, in company with others, went to the Forks of Elkhorn to go in swimming. They spent the afternoon about that place, and returned to Frankfort about 5 o'clock. Warren and Glass went on a picnic excursion into the country with some girls and spent the afternoon, returning to Frankfort about the same time that Lee and Warford returned. They met about 5:30 or 6 o'clock, and got in Lee's car and drove to Bellepoint, the home of Lee's mother. Each crowd during the afternoon had consumed a half pint of whisky. On their way to Bellepoint one of them purchased another half pint, which was largely consumed at the home of Lee. Before going to the home of Lee, it had been suggested that they go on a boat excursion on the Kentucky river, which was to leave the wharf at the rear of the post office building at 8 o'clock. Warren did not choose to go with them on the boat excursion. They made the trip to Bellepoint so that Lee might change his clothes.

After remaining at Lee's home about an hour, they again got in his car and drove back to Frankfort, driving to the wharf for the purpose of Lee, Glass and Warford embarking for the excursion. But, when they arrived at the wharf, they learned that it was some time before the

boat would leave; consequently they left the wharf, and drove about the town until the near approach of 8 o'clock, when they drove back to Wapping street, and stopped the car on that street without driving down to the wharf. Lee, Glass, and Warford got out of the automobile, and went down to the boat landing, leaving Warren in the car, and he immediately drove away in search of the young lady with whom he had a prior engagement.

Having thus briefly outlined the movements of Lee, Warford, Glass, and Warren up to the time they separated on Wapping street, three of them to go on the boat, and the other to go driving with a young lady, we will now briefly observe the movements of three other young men on the same afternoon which leads them to the wharf just at the time of the departure of the excursion boat. These three young men were Ed. Morrow, Nick Thomas, and "Steno" Cuffe. Morrow had been at home during the morning of the day, and after the noonday meal he went to Frankfort, and, in company with a friend of his, he spent the greater portion of the afternoon with a young lady. They were at her home and driving around the town a part of the time, and for a part of the time they were in the Frankfort Cemetery taking kodak pictures. Nick Thomas and "Steno" Cuffe were residents of Louisville, but they had been engaged for some weeks in Franklin county in installing an electric alarm burglar system at the Baker Distillery at the Forks of Elkhorn. While working there, they had become acquainted with Ed. Morrow, Leslie Costigan, and Billy Bell, all residing in the neighborhood of the Forks of Elkhorn. Thomas and Cuffe had spent the day in Louisville returning to Frankfort on an afternoon train, which was due to arrive at 7:45. When they arrived in Frankfort, they went at once to the restaurant of Frank McDonald on St. Clair street, where they met Ed. Morrow. It was proposed by some of them that they go on the boat excursion before alluded to. As Morrow, Thomas and Cuffe proceeded to the wharf, they fell in company with Leslie Costigan and Billy Bell. The five in this crowd and the three in the other crowd arrived at the wharf just as the boat was pulling off. Some one requested the captain to return, but he declined to so do. Among those who had been left on the wharf there was some rough language used towards the captain of the boat, but the proof does not disclose who used the language, and neither is it material in this

case.  Neither Warford, Lee, nor Glass knew Ed. Morrow, and presumably he knew neither of them.  There had been no communication of any kind either friendly or unfriendly between or among the two separate groups of young men.  The fact is they were not acquainted with each other, and, so far as the evidence disclosed, they had never met before.

When they realized that the boat had left, they all proceeded to go up the bank to Wapping street.  It is reasonably certain that Morrow, Thomas, Cuffe, and probably Bell and Costigan, were slightly in the lead, but closely followed by Lee, Warford, and Glass.  The evidence leaves the impression that they were all grouped close together.  In the meantime Warren had driven around town looking for the girl with whom he had the engagement, and about simultaneously with the approach to Wapping street by the crowd coming from the wharf Warren turned into Wapping street from St. Clair in the automobile.  At this moment Morrow, probably with Thomas, beside him, was stepping on to the street from the sidewalk, intending to cross from the river side of the street to the Catholic church side of the street.  As Warren drove the car by Morrow and Thomas, he passed very close, and probably splashed some water on Morrow. Morrow cried out to him; some saying he used a vile epithet, and others saying that he only said to him that he was driving pretty close.  After this incident the evidence becomes so confusing and conflicting that it will require a most careful analysis to determine the questions raised on this appeal.

The trial in the lower court resulted in finding the appellant guilty of manslaughter, and fixing his punishment at ten years' confinement in the penitentiary.  His first ground for reversal is that the verdict is not supported by the evidence, and that the court should have given a peremptory instruction directing the jury to return a verdict in his behalf.  It is for that reason that the evidence must be scrutinized with care.  The evidence as it related to Warford is rather fully set out in the opinion of his case, but there is a patent error at page 677 (281 S. W. 820), where the court stated that Warren with Lee and Warford were the men maltreating Cuffe when the policemen appeared upon the scene.  A reading of the opinion in full shows that the court used the word "Warren" where it meant "Glass."  This is fully borne out by

other parts of the opinion, and by the evidence quoted in the opinion.

The defense of appellant is based upon his theory of the case, that is, that, when he drove on to Wapping street he heard Lee whistle to him as he came from the wharf, and that he stopped and opened the door of the car so that Lee and his companions might again enter. When he did this, some one unknown to him struck him while he was in the car, and the blow rendered him unconscious, and that he absolutely took no part in the difficulty, and knew nothing of what was going on, and, when he regained consciousness the police officer was present, and the fight was over. He is fully corroborated by Warford, Lee, and Glass, and to a greater or less degree by other witnesses. When he was taken in charge by the police officer, there was evidence of his having received a severe blow in the eye, and his face was swollen and disfigured. If his evidence is correct, and if he took no part in the fight, assuredly he committed no offense. If there is no evidence showing that he took part in the affray, clearly he was entitled to an instruction directing his acquittal. Billy Bell was with the crowd as they came up from the wharf, and he thus stated what he saw:

> "As we came up the hill there, Edgar Lee, Warford, and Glass passed us, and, as we got almost to the top of the street, Leslie says, 'There is a fight there.' When we got there, Bryan Glass and this Warford boy was on Nick Thomas. I separated them, and Bryan Glass went to the back of the automobile, and got an automobile pump, and hit 'Steno' over the head. That was all I saw."

He did not see appellant at all.

Leslie Costigan was also in the crowd coming up from the wharf. What he saw is thus stated by him:

> "Thomas and Morrow were in front, and the car came along just as they got to the top of the hill, and I heard some loud talk, and, when I got there, Thomas and Warren were fighting.
> "Q. Was Warren out of the car or in it? A. He was right at the edge of it; just outside.
> "Q. Did he ever get down on the ground? A. Well, when Lee and Warford and Glass run in, Thomas shoved him backwards, or hit him, I could

not say which, and I don't know where he fell or what became of him; that was the last I saw of him.''

This witness did not see Ed. Morrow at all. He saw Lee, Glass, and Warford get into the fight, and he thus disclosed the next movement:

"Thomas began striking at them and backing away from them, and he backed off towards the Ragged Robin, and then they come back to the car, and got something out of the back of it, a pump and a jack, I believe, and throwed the jack at Thomas."

The next part of the fight which he saw was Cuffe and Glass fighting, and Warford and Lee took up for Glass. According to this witness, Warren passed out of notice at the very beginning of the fight. He saw Thomas push him back or strike him, but he did not see where he fell.

"Steno" Cuffe testified to what took place when he reached Wapping street as follows:

"Ed. Morrow and I was together coming up the hill, and, as we got to the top, a car came off of St. Clair street, and came near hitting us, and Ed. Morrow said, 'Look out, fellow; you came near hitting us.'"

He stated that the car proceeded 15 or 20 feet, when the driver of the car "got out of the car, and came towards Morrow, and started backing him; then three fellows came up, and jumped on Morrow, and Thomas got in it, and some one tried to hit Thomas with a pump, and I grabbed him."

The only time he mentioned the man that got out of the car was in the above quotation.

Nick Thomas is the next witness. He stated what he saw when he got to the top of the hill as follows:

"When I got up to the top of the hill, I seen a Ford coupe come near running over Ed., and he said, 'Look out, fellow; you come near running over me.' He went on, and then stopped and jumped out, and jumped on Ed., and I tried to separate them, and three of them jumped on me; somebody had me from behind, and I turned around, and somebody had me in front."

His only reference to appellant is in the above quotation, where he said that he jumped out of the car and jumped on Morrow. He tried to separate them, and three jumped on him, and then he told about the fight in which he was engaged with the three. His statement on that point is as follows:

"After they started fighting there, they had me right by the machine, between the machine and the sidewalk in a ring like, and they just kept me there; had me under the machine one time; somebody hollered 'Police' and, when they cleared away, that gave me a chance to get out of there."

He does not know the names of the three who were fighting with him.

Walter Gritton testified that he and his wife, with Sid Alfrey, were driving on St. Clair street, and passed by where the fight took place on Wapping. He saw a crowd there, but saw no fighting. The car turned into Wapping street, and he drove by the crowd. He stated that he saw Esbie Warren across the street towards the wharf; that he just went across the street, and he and another boy were cursing and talking loud. His statement as to whether there was any fighting going on when he saw this is as follows:

"Well, I didn't see no fighting at all. I saw Glass; he were there, too, but he was coming up from towards the wharf. Then there was some one, I don't know who it was; I thought it was Tots Wiard, Charlie Wiard's boy; he went a little bit above them towards St. Clair, and then the other boys went that way too."

This witness undertook to say that he thought he saw something in appellant's hand which might have been a knife, but he is vague and uncertain in his statements. He drove down the street to the next square, and turned around and came back, and, when he returned, he saw the policemen taking the boys away.

Jack Holland was a stranger in Frankfort. He was near the scene of the fight at the time it commenced. He saw the automobile turn into Wapping street, and some one came around behind it, and they started fighting about the back of the car. He did not know who began the fighting, but he saw several commence; as he put it:

"First one and then another; looked like from all sides." He saw a large crowd gather, and it seemed to him it was a "free for all."

W. S. Rosson, former mayor of Frankfort, was standing with John G. Rogers in front of the Baptist church. The first thing that attracted his attention was a crowd gathered near the side door of the Ragged Robin. He did not see the automobile turn into Wapping street. He disclosed what he saw in this language:

> "I was standing down there in front of the Baptist church, and saw this commotion, and Mr. Rogers and I walked over to see what it was, and, when I got on the corner, I saw there was fighting, and I stopped on the corner, and didn't get any closer to where the fight was going on. Mr. Rogers went on down to just about where the killing took place, but I didn't want to get that close, and just about that time I got over there—well, we both were over there together—there were two machines there, one right in against the curbing, rather close to the curbing, and the other one just a little west; had room to get between them. Someone, I don't know who it was, come to the back of this machine, and got a jack and pump.
>
> "Q. Which machine was that, the one next to the curbing or the one out in the street? A. No, sir; the one out in the street, the Ford coupe—and went back west on Wapping street, and by that time it looked like there was a general fight going on. Four of these boys fought out in front of the machine from over across in front of the Custom House."

He then stated that the fight going on out in front of the machine and over towards the custom house was participated in by Edgar Lee, Neville Warford, and Bryan Glass. They were all three beating up and maltreating Cuffe. He separated them about the time that John G. Rogers came over to the place of fighting. Rogers helped to separate them. Some one spoke from the crowd urging that Rogers should be killed, while another spoke from the crowd urging that Lee, Warford, and Glass be allowed to kill Cuffe, and throw him in the river. The voices from the crowd were not identified. He did not see appellant until after the fight was over, about the time the police came, when they were all trying to get in

the car.   He saw nothing the matter with appellant, except that he had a black eye and some blood on his face.

Miss Martine Monarch was in the Ragged Robin Restaurant when the fight was going on.  She was facing St. Clair street, and the light shone out at the window on Wapping street.  Just outside of the window on the sidewalk she saw a boy standing, and talking loud and ugly, making threats.  His talk was addressed to some one just back of her.  She could not see the person to whom he was talking.  The boy who was standing on the sidewalk talking loud and ugly, addressing his remarks to some one else, apparently on the sidewalk, was Neville Warford.  This witness heard someone say, "Kill him with a knife," or "with the knife."  She then turned away to avoid seeing what might happen, and, when she looked out of the window again, she saw a boy lying lengthwise on the sidewalk.  She could hear him gasping for breath, and recognized that he was dying.  There was a lot of confusion outside on the sidewalk.  She stated that what she heard and saw was on the sidewalk, but later the fighting went to the middle of the street, and clear to the other side.  She stated that they fought all the way across the street, and all of that was after the boy was dead.  She stated that the boy was killed at the very beginning of the fight.

John G. Rogers saw the fight, or rather the threatened fight, on the sidewalk near the Ragged Robin.  He saw Edgar Lee and Ed. Morrow.  Morrow had his back towards the restaurant, and Lee was facing him.  Lee placed his hand in his hip pocket several times and withdrew it.  Lee was near the curbing, and Morrow was near the wall of the Ragged Robin Restaurant. He heard Morrow say to Lee, "Shoot, damn you, I am not afraid of you."  He went into the Ragged Robin to telephone for the police, and, when he returned in a minute or two, he found Morrow lying on the sidewalk dying.   This witness saw the automobile turn into Wapping street, and, when it stopped, he saw a crowd gather around it. In answer to the question as to whether he saw Esbie Warren taking any part in the fight, he made this reply: "I never saw Esbie Warren in the fight at all."

Leslie Rogers drove on to Wapping street, and saw what he thought was a free for all fight, and he stopped his car nearly opposite the Catholic church, and walked back to the entrance of the Ragged Robin on Wapping

street.  While he was standing there a jack was thrown, and narrowly missed hitting him as it passed by, and struck the wall near the door of the Ragged Robin.  He saw only one person that he recognized, and that was Edgar Lee.  He saw him come up on the sidewalk near the entrance to the Ragged Robin, on Wapping street, and run towards St. Clair street.  He saw the boy lying on the sidewalk, and Lee was running towards him, but he did not know whether he was lying on the sidewalk when he saw Lee running towards him, but he saw him lying on the sidewalk about the time or soon after he saw Lee running.

J. P. Stafford was the police officer who came to the fight about the time it was over.  He stated that he did something that he had never done, "that was run all the way to the custom house."  When he got there, the fight appears to have been over.  He saw Mr. Rosson and Mr. John G. Rogers, and they both told him that a man had been murdered, and that one of the four did it.  The four were Esbie Warren, Edgar Lee, Neville Warford and Bryan Glass.  When he saw Warren, he disclosed what he saw as follows:

> "When I ran up Warren was on the right-hand side of the Ford coupe, and he was either kneeling in this position (indicating by kneeling on his right knee), or he had his hip on the fender; could not say which positively."

On cross-examination he made this statement referring to appellant:

> "He was either kneeling by the car or sitting on the edge of the running board of the car with one knee on the ground when I first saw him."

Further in discussing his condition he said:

> "Well, he seemed to be dazed.  He put his hand up to his eye like this (indicating).  He staggered ten feet, I reckon, and came back close to me.
> "Q.  What do you mean by 'dazed'?  A.  Well he was 'addled' then; we will put it that way."

Mrs. Walter Gritton was in the car with her husband when he claimed he saw Warren.  She stated that she saw him over near the wharf, and that he seemed to be walking around.

We have briefly referred to the evidence of the witnesses for the commonwealth which tends to connect Warren in any way with this tragedy. His witnesses, as has been stated, testified that he was knocked out before he got out of the automobile, and that he fell out in the gutter, and remained unconscious during the fight. They are in a way corroborated by the policeman, Stafford.

Considering the evidence as a whole, it is certain that the fight started at the automobile driven by Warren. Taking the proof most strongly against him, he engaged in the fight with Morrow and Thomas at the beginning of the difficulty. He was never seen after that. It is reasonably certain that the first development of the fight was away from the automobile to the sidewalk near the Ragged Robin. Neville Warford was on the sidewalk talking loud, and cursing. Edgar Lee was there facing Morrow. While the fight was going on near the Ragged Robin, some one said, "Kill the man with the knife," or "with a knife." The statement is admitted by some of those engaged in the difficulty who were indicted with Warren. They stated that Thomas was the man who had the knife, and, believing that he was going to use it, some one cried out to kill the man who had the knife, and not to kill a man with a knife. There is no evidence that Warren took any part in the fight on the sidewalk where Morrow was killed, and it is certain that he was not killed at the automobile, but 10 or 15 feet away, and at the place where he fell. The other branch of the fight appears to have been between Glass and Cuffe, until Lee and Warford finished whatever happened on the sidewalk near the Ragged Robin, and then participated in the fight between Glass and Cuffe. That Cuffe would have been killed but for the interference of Mr. Rosson and Mr. Rogers admits of little doubt. Warren took no part in that branch of the fight. His activities, if he took part at all, were confined to operations at the automobile in the beginning of the fight. It is not contended that there was any concerted action among the parties indicted before the beginning of the fight. If it should be admitted that Warren started the fight using no deadly weapon, and without any intention on his part to bring about the bloody tragedy, or without any knowledge on his part that any of the others participating with him had had any such intention, it could not be said that he was aiding and abetting in the commission of the felony. Anderson v.

Commonwealth, 193 Ky. 663, 237 S. W. 45; Powers v. Commonwealth, 197 Ky. 154, 246 S. W. 436; Bradley v. Commonwealth, 201 Ky. 413, 257 S. W. 11; Smiddy v. Commonwealth, 210 Ky. 359, 275 S. W. 872; Omer v. Commonwealth, 95 Ky. 353, 25 S. W. 594.

It appears to us at this time that it is a matter of grave doubt as to whether the verdict of the jury could be upheld on the evidence, but, as the case must be reversed for other reasons, we shall reserve our decision on this particular point.

It appears to us to admit of no doubt that there should have been an instruction submitting to the jury in apt language the defense of the appellant. Instruction No. 5 given by the court does not submit his defense to the jury. The jury should be told in appropriate language that, if the appellant was unconscious as the result of a blow given him by some one before the beginning of the fight, and that he took no part in the fight before the fatal blow was struck, he should be acquitted, or that, if after the fight began, and before the fatal blow was struck, he was either rendered unconscious from the blow or that he in good faith withdrew from the difficulty before the fatal blow was struck, he should be acquitted. An instruction similar to that directed by this court to be given in the case of Bradley v. Commonwealth, should be given on another trial.

It is insisted by counsel for appellant that instruction No. 1 did not give appellant the right to act in the necessary, or to him apparently necessary, self-defense of Bryan Glass, Edgar Lee, or Neville Warford, and that this error was not cured by the fourth instruction, as the fourth instruction did not name the parties in whose defense he might act. Since the case must be reversed, we would suggest that these instructions be made clear on these points, although we would not reverse the case on this ground, if there were no other error in the record. We do not believe they were prejudicial to the substanial rights of the appellant in the form in which they were given.

The evidence which was introduced showing that appellant had been convicted of a misdemeanor and confined in prison will be omitted on another trial, as it was incompetent.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.