## Chaplin v. Commonwealth.

(Decided March 15, 1911.)

### Appeal from Wayne Circuit Court.

1. Evidence—Previous Difficulty.—Upon a trial for murder, it is permissible for the accused to show a previous difficulty between himself and the deceased, in which the deceased was the aggressor.

2. Evidence—Previous Statement to Show Intent.—An engagement of the accused to visit a neighbor who lived near the deceased, and made previous to the homicide, is admissible for the purpose of showing the object of the visit, and to negative the claim that the accused went there for the purpose of finding the deceased.

3. Evidence—Character of Deceased.—Former specific acts of crime on the part of the deceased are rightly rejected as having no connection with what took place at the time of the homicide.

4. Instructions.—Where one instruction properly and fully gave the law of self-defense, it was error to give another instruction, which limited that right.

5. Challenges to Jurors—Review of Questions not Shown by Record.—The act of the circuit judge in giving the Commonwealth six peremptory challenges in a prosecution for felony, instead of limiting it to five as provided by section 204 of the Criminal Code of Practice, can not be reviewed where the ruling of the court is not shown by the record.

6. Jury—Discharge of—Discretion of Trial Judge.—The length of time a jury should be held for deliberation with the view of finding a verdict, and the grounds that will be sufficient to justify the court in discharging them when they fail to find a verdict, rests largely in the sound discretion of the trial judge.

Wí R. CRESS & SON for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The appellant, Charles Chaplin, was indicted by the grand jury of Wayne county for the murder of Wellerford Gilbert. Upon the trial, Chaplin was convicted of manslaughter and sentenced to the penitentiary for a term of eighteen years; and from a judgment upon the verdict he appeals.

The facts which preceded and accompanied the murder are as follows: On March 10, 1910, Chaplin was at work at Owen's still house, some two miles from his home; and while he was eating his lunch, Gilbert, John W. Bell and Jordon Bell went to the still house. Shortly thereafter, Chaplin, Gilbert and the Bells, in company with Rednour, left the still house together and started on their way home. While passing through an old field, Gilbert and Chaplin engaged in a difficulty, in which Gilbert struck at Chaplin with a knife, cutting his coat on the shoulder and breast for some eight or ten inches. Chaplin ran away from the scene of the trouble and went to his home about two miles distant. He remained at

home for something like an hour, when, as he claims, he recalled an engagement he had to visit Marcus Sloan, an old acquaintance, who resided in Oklahoma, and who was then visiting his mother and brothers in the neighborhood and near where Gilbert lived. Chaplin, having told his children of his intended visit, took his gun, called his dog, and by a near path which led through the woods he went to Jeff Sloan's to see Marcus Sloan, arriving there at about 4:30 o'clock p. m. As he approached the house he met Jeff Sloan leaving the house and going to get some wood. Jeff invited Chaplin to go into the house and have a seat. Chaplin, not suspecting, as he claims, that Gilbert was in the house, approached the front door and saw Gilbert's wife and Mrs. Sloan holding Gilbert and taking him out at the back door of the room Chaplin was about to enter. Gilbert and his wife, who lived very close to Jeff Sloan, had gone over to Sloan's in the afternoon to pay a visit. Gilbert was drinking and talking a good deal about the difficulty which he had had with Chaplin. Some one saw Chaplin coming along the road with his gun, and immediately went into the house and informed Mrs. Gilbert of his approach; whereupon she and Mrs. Sloan undertook to get Gilbert to go home by the back way and thus avoid meeting Chaplin. Gilbert, however, jerked himself loose from the women and started toward Chaplin and the front door; and just as he was crossing the room, Chaplin saw Gilbert thrust his hand into his pocket; whereupon Chaplin drew his gun upon Gilbert and demanded that he stop and come no further. Gilbert stopped, told Chaplin that he was not coming upon him, that he did not know Chaplin was there, and that he (Gilbert) had started home. Gilbert then turned and walked with his wife over near the fire, and sat down. Marcus Sloan took Chaplin away from the house, saying that he must not have any trouble with Gilbert. Marcus and Chaplin went up the road and remained for half an hour or more, talking over old times, and then returned to the house together, Marcus having possession of Chaplin's gun. Gilbert was still at Jeff Sloan's house, and, upon the return of Chaplin, Gilbert started to leave the room to have a talk with Chaplin, saying that he had but one time to die. Jeff Sloan attempted to restrain Gilbert, but failed. By this time Chaplin had reached the front gate, some twenty feet distant from the house.

When he saw Gilbert struggling to get loose from Jeff Sloan, Chaplin grabbed his gun out of the hands of Marcus Sloan and told those near by not to let Gilbert come out. At the same time Chaplin began to back away from the gate. Gilbert refused to heed the warning, but went out at the gate threatening to kill appellant, according to the testimony of some of the witnesses, and at the same time searching his pockets as if trying to find a pistol. After he passed out the front gate and turned up the road toward Chaplin, Gilbert thrust his hand in or towards his right hip pocket; whereupon Chaplin shot and killed him.

The grounds for reversal may be classified and considered under the following four general heads:

(1) That incompetent evidence was admitted, and competent evidence rejected.

(2) That the court erred in giving instruction No. 5, which, appellant claims, took away his right of self-defense.

(3) That the court erred in allowing the Commonwealth six peremptory challenges in making up the panel; and

(4) That the court erred in refusing to sustain appellant's motion to discharge the jury after it had been held together from Saturday, November 19, until Wednesday, November 23.

1. The appellant offered to prove the difficulty which had occurred between himself and Gilbert as they were passing through the old field, and in which Gilbert had struck at Chaplin with a knife and had cut his coat, as hereinbefore related. This evidence was offered for the purpose of showing the alleged evil disposition of Gilbert, and to sustain appellant's plea of self-defense by showing which of the parties was the aggressor in the final tragedy which took place some four or five hours later. We are clearly of opinion that this was competent as evidence, and that the court improperly rejected it. The difficulty had occurred only about four hours theretofore, and, in the meantime Gilbert had been talking about it, and bragging that it was Chaplin, not Gilbert, who had run away from it.

The question of admitting testimony of a previous attack by the deceased was carefully considered, and the limitations upon the rule admitting it pointed out in White v. Commonwealth, 125 Ky.; 705, where testimony

of that character was held admissible as tending to show the animus of deceased towards the accused, and whether the latter, at the time of the homicide had reasonable grounds to believe, and did in good faith believe that he was in peril at the hands of the deceased. And, as to the extent and range of such testimony, the court there said:

"We do not mean to say that it would have been proper for the court to have allowed evidence as to all the details of the cutting and wounding of appellant by Layne, or of the assault made upon him by the latter with a club, but the fact that both assaults occurred, the general character of the injuries received by appellant at the hands of Layne, and the further fact that the latter was the attacking party should have gone to the jury in evidence."

Also, in an extension of the original opinion, the court further said:

"Where the defendant introduces proof as to an assault by the deceased on him, the Commonwealth may show that the deceased did not so assault the defendant, and to this end may show what did occur at the time referred to. But the proof should be limited to the res gestae and much detail should be avoided. The court should charge the jury that the evidence is not admitted to show who was to blame in that difficulty, and is only to be considered by them on the question whether at the time of the homicide the defendant believed, and had reasonable grounds to believe, he was then and there in danger of death or great bodily harm at the hands of deceased."

Under this rule, and to the extent and for the purpose therein stated, the testimony relating to the difficulty earlier in the day was competent and should have been admitted.

Some time previous to the day of the killing of Gilbert, Chaplin met Mrs. Lucy Sloan, the mother of Marcus Sloan, and she, in answer to an inquiry from Chaplin, told him that Marcus would return to Oklahoma within a few days; whereupon Chaplin told her to tell Marcus that he (Chaplin) would be over to see him before he left. He had heard that Marcus was to leave for Oklahoma on the day after the trouble occurred, or about that time. Upon the trial, Chaplin offered to prove this conversation with Mrs. Sloan for the purpose of showing

the reason why he went to Jeff Sloan's house on the day of the killing; and evidently for the purpose of negativing the claim that he went there with the view of finding Gilbert, whom he knew lived in the neighborhood. The circuit judge excluded this testimony; and in this ruling we think he was in error. The conversation between Chaplin and Mrs. Sloan occurred several days before the trouble had arisen between Chaplin and Gilbert, and Chaplin was entitled to the benefit of his action if it was based upon that understanding or engagement with Marcus. Evidently the theory of the Commonwealth was that Chaplin went to Sloan's house with his gun for the purpose of seeking out Gilbert and killing him. If Chaplin went to Jeff Sloan's house for the sole purpose of seeing Marcus Sloan, the Commonwealth's theory was not true; and, in order to combat the Commonwealth's theory, Chaplin had the right to show by this conversation with Mrs. Sloan, which took place several days before the shooting, that he had agreed to make the visit which he did make on the occasion of the shooting. Its weight and value for the purpose offered lies with the jury; but they should have the right to hear and pass upon that weight and value.

Chaplin also offered to prove that Gilbert had on several occasions said he had killed a white man and a negro, but the court rejected the evidence. In this, we think the court ruled properly, since former specific acts of crime committed by the deceased are held rightly rejected as having no connection with what took place at the time of the homicide. (3 Greenleaf's Evidence, Lewis' Ed., Sec. 27.)

2. It is further contended that, in giving instruction 5, the court took from appellant his right of self-defense. There is no objection to the other instructions given, and they will not be noticed, with this exception: In order to fully understand the fifth instruction, we here copy it in connection with the fourth instruction:

"4. Although you may believe from the evidence beyond a reasonable doubt, that the defendant shot and killed the deceased, yet if you shall further believe from the evidence that at the time he did so shoot and kill the deceased, if he did so do, he believed and had reasonable grounds to believe that he was then and there in danger of death or the infliction of some great bodily harm, at the hands of deceased, and that it was necessary or was

believed by the defendant in the exercise of a reasonable judgment to be necessary, to shoot and kill the deceased in order to avert that danger, real or to the defendant reasonably apparent, then you ought to acquit the defendant upon the grounds of self-defense or apparent necessity therefor.

"5. But if you shall believe from the evidence beyond a reasonable doubt that the defendant sought out the deceased and commenced the difficulty with him by drawing or attempting to draw upon him a shot gun, then you ought not to excuse the defendant on the grounds of self-defense or apparent necessity therefor; unless you shall believe from the evidence that he in good faith abandoned such assault and difficulty, and then the deceased, seeing or knowing of such abandonment began to assault the defendant by making demonstration as if to shoot him or do him other great bodily harm, and that it was necessary or was believed by the defendant in the exercise of a reasonable judgment to be necessary, to shoot and kill the deceased, in order to avert that danger real, or to the defendant reasonably apparent, in which event you ought to acquit the defendant upon the grounds of self-defense or apparent necessity therefor."

We are of opinion that the fourth instruction covered the law of this case as to self-defense, and that the fifth instruction should have been omitted. Inasmuch as the fourth instruction covered the case in so far as the issue of self-defense was concerned, the fifth instruction, which qualified that right in some material respects, was not only erroneous under the facts of this case, but was wholly unnecessary and misleading.

3. The contention that the circuit judge erred in allowing the Commonwealth six peremptory challenges in making up the panel, when section 204 of the Criminal Code only gives the Commonwealth five peremptory challenges in prosecutions for felony, will not be considered because the alleged error is not shown by the record. In their brief, counsel for appellant do not show where any such ruling was made, and, after a careful reading of the record, we have been unable to find any such ruling by the circuit judge.

4. It is also claimed that the circuit judge erred in overruling appellant's motion to discharge the jury on November 23. The case was submitted to the jury on Saturday, November 19, 1910, at one o'clock p. m., and

after having deliberated that day they were adjourned until Monday, November 21, in charge of the sheriff. The same procedure was had on Monday, Tuesday and Wednesday, the 21st, 22d, and 23d, when the jury were adjourned from day to day. On the 23d the appellant moved the court to discharge the jury, without assigning any grounds or cause for the motion. The court overruled the motion to discharge the jury, and adjourned it until the next day, Thursday, the 24th; and upon that day the jury, by unanimous vote, brought in the verdict complained of.

Section 251 of the Criminal Code provides that "if, after being kept together such a length of time as the court deems proper, they do not agree in a verdict, and it satisfactorily appear that there is no probability they can agree, the court may discharge the jury." Necessarily, the length of time the jury should be held for purposes of deliberation with the view of finding a verdict, and the grounds that will be sufficient to justify the court in discharging them when they have failed to find a verdict, must rest largely in the sound discretion of the trial judge. Gilbert v. Commonwealth, 21 Ky. Law Rep., 416. In the case at bar it does not appear that the jury ever reported to the court that they could not find a verdict, or that there was no probability of their being able to find a verdict, or that they said anything whatever upon that subject. Moreover, as above suggested, appellant's motion showed no cause whatever for the discharge of the jury. The motion was based upon the single proposition that the jury should be discharged after having deliberated three days, or possibly four, without having found a verdict. We do not think the court abused its discretion in overruling appellant's motion to discharge the jury, and in holding it as it did until the succeeding day.

For the reason given, the judgment of the circuit court is reversed and a new trial ordered.