## Crenshaw et al. v. Commonwealth.

(Decided December 21, 1928.)

C. P. BRADBURY and A. E. FUNK, JR., for appellants.

J. W. CAMMACK, Attorney General, and J. M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On May 15, 1928, the judge of the Bullitt circuit court, Hon. Basil Richardson, by notice duly posted

called a special term of that court to convene at Shepherdsville, the county seat of the county, on the 28th day of May following the date of the call, and to continue for all juridical days intervening between that date until and including the 9th day of June, 1928. The reason for calling the special term, as set out in the call, was the existence of an emergency, and the condition of the criminal docket in that county, and which emergency was the recent perpetration in the county of the crime for which appellants and the other defendants were indicted. The indictment accused those named therein (Clarence Crenshaw, Elmer Crenshaw, John H. Bolton, Frank Hodge, Shelby Hodge, Less Hodge, Golden Hodge, Jim Harris, and Frank Kinder) of committing the crime of murder by shooting and killing Kate Browning, and which was done in Bullitt county and before the finding of the indictment. In the first count all of them were charged with the killing, and in following counts the murder was charged to have been committed by one or more of them, or by a person or persons to the grand jury unknown, and that the others were present, aiding, assisting, and abetting those who actually perpetrated it.

Defendants were tried at the same special term, and all of them were convicted and punished by confinement in the penitentiary for and during their natural lives. On the hearing of their motion for a new trial, the court sustained it as to the three defendants, Less Hodge, Golden Hodge, and Jim Harris, but overruled it as to the other six against whom judgment was pronounced in accordance with the verdict, and to reverse it they prosecute this appeal.

The record is large. The briefs are many, and the motion for a new trial contains 29 grounds therefor, some of which are repetitions of others, but because many of them are immaterial, or, if they contained error, it is non-prejudicial, we will not attempt to discuss all of them seriatim, but will content ourselves with a discussion and determination of only those that we deem of sufficient merit to call for consideration.

It is first urged as a ground for reversal that the court was without authority to call the special term at which defendants were indicted, tried and convicted, in the manner it did, i. e., by notice posted at the courthouse door as permitted by the first part of section 971-13 of the 1928 Supplement of Carroll's Kentucky Statutes, and which was an act of the 1926 session of the Legislature, and being chapter 31, page 128, of the Acts for that year.

The argument in support of this ground is that at the date of the call for the special term a regular term of court was in session in Larue county in the same judicial district, and that upon the date the special term convened under that call, and throughout the days of its sitting as designated in the call, and during which defendants were indicted and tried, a regular term of the Nelson circuit court was provided for by law, and that under section 971-13, supra, of the statute a special term of court called to be held "while a court is or may be in session in the same or some other county in the district" must be called by an order of court entered at the last regular term for the county in which it is called, and that no such term can legally be called by posting of notices. This ground was raised by a special demurrer to the jurisdiction of the court, and by other various motions made after the indictment was returned.

The determination of it calls for a brief history of the law with reference to the calling of special terms of circuit courts. In 1893, the Legislature enacted section 964 as now contained in the 1922 edition of Carroll's Kentucky Statutes, except the amendment that was added thereto by an act passed in 1894 (chapter 94). As first enacted the statute read:

"In each county of said districts, except counties having continuous session, there shall be held each year the number of terms of the circuit court provided for by law, and the term in any district may be extended, if the business requires, so that it does not interfere with any other term in the district; and whenever it is necessary to transact the business, a special term may be held in any county, either by an order entered of record at the last preceding regular term in the county or by notice signed by the judge and posted at the courthouse door of the county for ten days before the special term is held. The order or notice shall specify the day when the special term is to commence, and shall give the style of each case to be tried, or in which any motion, order or judgment may be made or entered at the special term, and no other case shall be tried, or motion, order or judgment entered therein, unless by agreement of parties."

The 1894 amendment only provided for grand juries at any special term of court, if the judge thereof was of the opinion that such emergency existed as to require it.

As so amended the section remained until 1906, and at that session, by chapter 23, page 249, Acts of that year, section 964 was amended by adding thereto section 964a1, but the amendatory statute as it appears in the 1906 Acts consisted of only one additional section, which was designated as section 964a and which itself was divided into sections 1 and 2, but the publishers of the Kentucky Statutes, in printing section 964 as amended by the 1906 act, duplicated the original amended section, and designated the duplication as section 964a2, and they likewise duplicated the first section of that amendment and designated that duplication as section 964a3. So that all the statutory law with reference to the calling of special terms of court from and after the 1906 amendment was contained in sections 964 and 964a1 of the 1922 edition (and others since 1906) of Carroll's Kentucky Statutes. Section 964a4 of such editions was section 2 of the 1906 act. The law relating to the calling of special terms of court remained in that condition until the 1926 act was passed, and all of the prior acts upon the subject, in so far as they related to the power and authority of the presiding judge to call a special circuit court term, were consolidated in section 13 of the latter act and which is now section 971-13, supra. That consolidated section made some slight changes in the 1906 act, one of which was that a grand jury might be impaneled for a special term called under that amendment.

The constitutionality of the 1906 amendment was before this court in the case of L. & N. R. R. Co. v. Herndon's Adm'r, 126 Ky. 589, 104 S. W. 732, 31 Ky. Law Rep. 1059. It was contended therein that the amendment was unconstitutional (a) because it attempted to provide for the holding of a special term of court at the same time that a regular term of either that or some other circuit court was being held in the same judicial district, or at a time when such regular term was provided for; and (b) that it violated the provisions of section 51 because of a variance between its title and its body. Both objections were overruled. Objection (b) is not involved in this case, since the original section (964) as well as the 1906 amendment was re-enacted in 1926 in consolidated form and under a title fully complying with section 51 of the Constitution. In disposing of objection (a), this court in that opinion said that the 1906 amendment was unnecessary in order to empower a circuit judge to call

a special term of court in his district to be held at the same time designated by law for the holding of a regular term in either the same or another county in his district, and the case of Paducah Land, Coal & Iron Co. v. Cochran, 37 S. W. 67, 18 Ky. Law Rep. 465, was cited in support of that statement. In the latter case a special judge who had been appointed to try the case sat and heard it as such special judge, and at a special term held at the same time the regular term was going on in the same county, and the opinion in effect held that the original section 964, which, as we have said, was enacted in 1893, contained nothing militating against that, but, on the contrary, authorized it. That opinion was rendered prior to the 1906 amendment, and the learned judge who wrote the Herndon opinion was correct in saying that the amendment was unnecessary to authorize the holding of a special term of circuit court at and during the same time another regular term in the district was being held, or might be held.

Moreover, in the case of Penman v. Commonwealth, 141 Ky. 660, 133 S. W. 540, defendant was indicted and tried at a special term of the Lincoln circuit court called to convene September 28, 1910, at which time, and on the date of the call (September 15), a regular term of circuit court for that district was being held in Danville, Boyle county, both counties being the same circuit court judicial district. Defendant made appropriate objections to the validity of the special term at which he was indicted and tried. The 1906 amendment to section 964 of the then Kentucky Statutes was in force and constituted a part of it. But, notwithstanding the fact that the special term was called by posting of notices by the circuit judge, defendant's conviction was upheld and his objections to the validity of that special term were overruled. It is true that the objection now under consideration was not expressly referred to in that opinion, but the member of the court who wrote it (Judge Carroll) was most painstaking and ever particularly alert to protect the legal rights of all those who were so unfortunate as to become criminally accused. Nevertheless, quoting from the syllabus, also prepared by him, he said: "The circuit judge may call a special term whenever in his judgment the business requires it; and at such special term he may impanel a grand jury and try at such term persons who are indicted thereat."

Independently of the foregoing, which we think sufficiently answers this objection, if counsel for defendants are correct in their contention, then the provisions in the statute for calling special terms in cases of *emergency* would be of little avail, because it would necessarily be confined to an emergency that arose during a regular term of court in the county in which the special term was called. No better illustration could be given of that statement than.is furnished by the facts of this case. The regular term of the Bullitt circuit court (and at which this special term should have been called, by an order entered thereat according to defendants' counsel), had adjourned at the time the emergency arose requiring the special term. At that time the judge of the district was engaged, in holding regular terms in other counties of his district, and, unless he could call, by notice, a special term of the Bullitt circuit court to take care of and deal with that emergency, it could not be done at all, in which event the intent and purpose of the Legislature to have such emergencies dealt with at a special term would be entirely defeated.

The case of Sowders v. Commonwealth, 197 Ky. 834, 248 S. W. 187, relied on by defendants' counsel, decides nothing to the contrary. The special term there involved was called to convene at a time not devoted to any other regular term in the district, and all that was said in the opinion of an interpretative nature of section 964a1 (now a part of the remodeled section 971-13 of our present statutes) was not pertinent to the question involved, and to that extent it was and is dictum. If, however, it were otherwise, then we find nothing in the dictum (if it should be so designated) that sustains counsel in this contention, since at the time of rendering that opinion no grand jury could be convened at a special term called under the section above (964a1), but which the 1926 act corrected and expressly provided for the convening of a grand jury at such terms. Moreover, it was recognized in the language containing the dictum, if any, that the Legislature unnecessarily assumed (and which is substantiated by our opinion in the Cochran and Herndon cases, supra) that under the old section 964 no special term could be called in any manner, if it occupied any time allotted by the Legislature to a regular term of the county in which it was held, or that of any other county in the district. The opinion therein did not hold that no such special term could be called and held under the provisions of the old

section 964. On the contrary, it was expressly said therein that the 1906 amendment to the old section was only intended to add to it, and not change it, and nothing contained therein, though it be classified as dictum, is in conflict with our two prior opinions above referred to. We therefore conclude, especially since the consolidation of all the statutes by the 1926 act, that the special term at which defendants were indicted and tried was properly called and held and this ground must be and it is overruled, and which brings us to a consideration of the merits of the case.

Four alleged general errors are confidently urged in briefs of counsel, either one of which or either of their subdivisions, as they insist, is sufficiently prejudicial to authorize a reversal of the judgment. The general ones are: (1) That the verdict is flagrantly against the evidence, and is not sustained by it; (2) error of the court in the admission and rejection of testimony; (3) misconduct of the commonwealth's attorney in his argument to the jury and the latter's misconduct, as well as that of the officer having it in charge; and (4) erroneous instructions and refusal of the court to give to the jury the whole law of the case.

■ In determining ground (1) it will be necessary to make reference to the testimony heard at the trial, but our purpose will be served by giving only a brief summary thereof, since a detailed statement of all of it would make of this opinion an average sized book. Two elderly women, whose names were Kate and Lou Browning, with four children of the latter (Amanda Jones, Angie Browning, Bennie Browning, and Peachie Browning), lived in a small one room log hut in Bullitt county. It had no windows to it, and the entrance door was about midway its length, and the shutter for it was made of thin pine and oak boards or slabs. The entire family of six cooked, ate, and slept in that room, the roof of which was some kind of treated paper with cracks in the floor between the planks. They were evidently far removed from refinement, and their squalor and degradation are sufficient to excite the pity of the most hardened and calloused disposition; yet a reading of this large record discloses no act of premeditated dishonesty on the part of any of them.

On May 4, 1928, Lou Browning reported to the federal prohibition officers at Bardstown the fact of a still

being operated on the farm of the defendant, Bolton, or immediately on the line between him and one of the defendants, Crenshaw. Federal officers returned with her to the neighborhood, and she directed them to a point not far distant from the still, which was located up a hollow off the road. The officers proceeded, and found the still in full operation, with two persons present, the defendant Elmer Crenshaw and another who escaped. The former was arrested and taken to Bardstown, where he executed bond, but in carrying him away in an automobile the officers also carried the prosecuting witness to or near her home located in the same vicinity. That same afternoon another of the Brownings, or possibly the same one, passed a field not far from the still in which the defendant Kinder was at work, and he said to the member of the Browning family: "I understand you have joined the prohibition men;" when she answered, "Yes, sir; don't you want to join?" He replied, "No, and by God, you'll be damned sorry for it."

The same afternoon and after that conversation one of the indicted, Hodges, went to the squalid hovel of the Browning's on pretense, as he represented to them, of getting some chewing tobacco, but according to his testimony he was then playing the part of detective to discover whether the Brownings had in their possession any articles of merchandise that had been recently stolen from a store at Deatsville, a nearby village. He was on that mission, notwithstanding he was not interested in the store that had been burglarized. He found nothing and later disappeared. That night Harris, another defendant in the indictment, went to the Browning hut on a mission, as he and they say, of procuring one of the boys, who were grown men, and one of whom was then an adult, to chop some wood for him. The only one present, Bennie, declined to accept the employment for some reason, but told Harris that his brother, Peachie, who was then visiting in the neighborhood with relatives, might accept the employment; and later Harris left at between 10 and 11 o'clock. Peachie subsequently returned and the members of the family retired for the night.

At about 12 o'clock, and before at least two of them had gone to sleep, they discovered a fire on the roof of the hut, as well as one under the floor. The crude door shutter was fastened on the inside with an old-fashioned

wooden button, and there were holes in it and its facing, through each of which ran a chain that was locked on the outside with a padlock when the members of the family were away. Upon discovering the fire, one of the boys turned the button to open the door, and it was discovered to be fastened, or, in other words, the two ends of the chain, as subsequently developed, were fastened with a wire so that the door could not be opened from the inside. There happened to be in the house an ax with two blades and no back, and after discovering that the door was fastened on the outside one of the boys took the ax and endeavored to make a hole in the door so that the inmates might escape. Immediately after he commenced using the ax, shots were fired into the door, some of which struck him upon different parts of his body. The other boy immediately took the ax with a like experience, and then the practically grown girl, Angie Browning, undertook the job, followed by the same consequences. From the effects of the shots so fired from the outside Kate Browning had one of her eyes shot out, and Amanda Jones had also received slight flesh wounds. However, they did finally succeed in chopping out a sufficient opening in the door to enable them to escape, and they went out of the house, as we gather from the proof, single file.

As they emerged, and immediately thereafter, they discovered an armed mob in front of and around about the hut, and every indicted defendant was recognized either by voice or sight, and by some one or more of the Brownings. They were necessarily frightened and soon became more or less scattered. Shooting occurred on the outside, and Kate Browning, who had lost an eye in the house and who was 62 years of age, remarked after she got a short distance away that she could go no farther and fell to the ground. The others, who were fleeing for their lives, did not tarry. One boy found a lodging place later in the night in some stable or barn, as did the other also, but at a different place.

Some quarter of a mile from the hut, and while shooting was still going on and the house still burning, the three escaped females, with Peachie Browning, met two of the Hodges in the road, not far from the residence of a Mr. Bivans, and the fleeing victims were halted by them, with the command from one of the waylayers that, if they did not do so, he would kill the whole "damn bunch." They managed to get by him, but not until after

he had fired some shots across their pathway, and they finally arrived (except Peachie) at the home of Mr. Bivans, where they spent the night. Early the next morning the same persons went to the scene of their destroyed habitation and found Kate Browning, slightly removed from the spot where she fell, but still alive, and she was lying in a thicket by the side of the path that she was traveling when she fell the night before. There were wounds on different parts of her body, the largest of which was in the breast, and the shot that produced it was from the front, and it was sufficient, according to proof, to produce her death. She died in about 30 minutes after she was so found, never having regained consciousness. All nine of the tried defendants were indicted, charged with her murder, resulting in their conviction and following consequences as hereinbefore set out.

Each of the defendants relied on an alibi, and their testimony and that of their witnesses presents a remarkable condition of wakefulness at the midnight hour of the fatal night in that small community of not exceeding two or three miles in diameter. It was likewise coincidental that there was the amount of visiting among defendants and the members of their families, as well as by some of their friends, on the fatal night and at that late hour. But a reading of the alibi testimony is by no means convincing, in the light of admissions and developments brought to the surface by cross-examinations. Some of the alibis, that of defendant Bolton being now recalled, did not reach far enough into the night to effectually serve its purpose. His two young daughters and a girl visitor testified that the youngest daughter became sick in the night, and the oldest one started from their bedroom upstairs to the first floor to procure some remedy for her relief, and asked her father for a match, when he answered that none was needed, but whether he was dressed or undressed at that time witness did not know. However, that was about 11 o'clock, and the mob did not arrive at the scene of its depredations until 12 o'clock, according to the Brownings and some nearby neighbors, and Bolton lived no great distance from the Browning hut. We cite the testimony as to his alibi as an illustration. Similar weak points in those of the others could be pointed out, if it was deemed necessary. Bolton was justice of the peace in that magisterial district, and there-

fore a conservator of the peace and good order, but it was proven by one of the female witnesses that he was seen going from the public road to the site of the still with a load of sacked meal shortly before the still was raided.

Somewhere about 9 o'clock a. m. of May 5, which was the next morning after vengeance on the Brownings had been wreaked, the sheriff and the county attorney of the county went to that neighborhood, and they passed the residence of Squire Bolton. He did not tell them what had happened, nor was the trip of the officers made at his request, but which latter would have been the most proper thing for him to have done as a conservator of the peace. On the contrary, he asked them where they were going, and when they told him they asked him to go along with them. He replied, according to the testimony of the sheriff: "He just said that he did not have time, and did not think that there would be any use of him going." At least one and perhaps others of the defendants did assist in burying Kate Browning later in the day, but the shocking conduct of the mob and its unparalleled brutality failed to produce any arousal of feelings of indignation amongst any of the defendants on account of the unthinkable savagery that had been both actually and attempted to be perpetrated by it. It is likewise a curious coincidence that many of the defendants happened to meet and confer with each other the morning after the report became current of what had happened the night before, and one would infer from the testimony that, as the report expanded and indignation became current in more remote vicinities, the counseling between or amongst them became more serious. When the officers within a day or so thereafter attempted to arrest one of the Hodges, he tried to escape, which he explains by saying that, when he discovered that the persons approaching him were officers, he became frightened and ran, from which it is to be gathered that, if they had been private citizens, and not officers, there would have been no fright on his part, and he would have saved himself the useless exercise in making his flight.

The absolute necessity of putting each witness on the stand in his own behalf was glaringly apparent to learned counsel who represented them; but in examining their clients the few questions they propounded and their brevity has not escaped us, since their adopted method

indicates that they were extremely apprehensive of possible danger and the necessity of "touching lightly." As an illustration of what we have said, and as a pattern applicable to the examination of the other defendants, we insert the entire examination in chief of Clarence Crenshaw:

"1. What is your name? A. Clarence Crenshaw.

"2. Where do you live? A. Up in Leeches.

"3. How far from here, in your best judgment? A. About seven miles.

"4. How old are you? A. Fifty-four.

"5. How far is it from your house to where Lou Browning lived? A. The way you have to go around the road, it is about five miles.

"6. How far do you live from Squire Bolton? A. It is about a mile from my house to the church, and about a half a mile from the church to his house; that would make it about a mile and a half.

"7. On the night of May 4th, the night that Kate Browning is said to have been shot, where were you? A. I was at home.

"8. Did you shoot Kate Browning? A. I did not.

"9. Did you counsel, aid, advise, or assist anybody else to kill Kate Browning A. No, sir; I did not.

"10. Were you up at Browning's that night? A. No, sir.

"What time did you go to bed that night? A. Between 8 and 9 o'clock."

It will be observed that it consists of only ten short questions and answers. The same examination of defendant Bolton consisted of only 12 questions and answers of like tenor, and so on as to all the others. Later defendant Bolton in his testimony denied hauling the meal to the still, as did the Hodges deny the meeting of the prosecuting witnesses on the road while the work of the mob was yet unfinished.

Defendant Kinder was not asked in chief about the conversation with reference to the prosecuting witness joining the prohibition forces, but the commonwealth did ask him concerning it, and he admitted it, with the modification that, in answering that "You will be damned

sorry for it," he gave as a reason that the Crenshaws had been friends of the Brownings, and that the favors they had done them as a result thereof would thereafter cease. The evidence as a whole leads to the unerring conclusion that there was a fellow feeling between the other defendants and the one or ones who operated the still, and that more or less indignation existed among all of them because of its discovery and destruction, and which had been brought about through the activities of the Brownings. Defendants also impeached each of the Brownings for truth and veracity, as well as for morality and uprightness. We have already devoted considerable time and space to a summary of the testimony, and it would serve no useful purpose to state it more in detail. What we have said does not contain all the proved circumstances and collateral facts that strongly support our indicated conclusions, but it is sufficient to convince any unbiased mind that the verdict is not only sustained by the evidence, but that the jury was warranted in returning it. Hence we conclude that this ground is without merit.

■ Ground (2) may be divided into subdivision (a), admission of incompetent testimony offered by the commonwealth, and (b), the rejection of competent testimony offered by defendants. Under subdivision (a), it is strongly argued that the testimony of the report and capture of the still was incompetent, and likewise that with reference to the conversation with defendant Kinder, and that relating to the defendant Bolton, being seen with a load of meal going in the direction of the still, and also that with reference to what occurred between the Hodges and the fleeing prosecuting witnesses while the mob was yet in session and had not dispersed.

We do not find ourselves able to agree with learned counsel in either of their arguments. All of such testimony, at least, had a tendency to establish a motive on the part of the particular defendant to which it related; but as to whether it was competent as against the others depends upon the existence or nonexistence of a conspiracy to be hereinafter discussed. If the jury were authorized from the testimony as a whole to find the existence of such conspiracy, then all of the complained of testimony would be competent, not only against the particular witness to whom it related, but also as to the others who were members of the conspiracy, if any. The

238

stated propositions are so fundamental that we deem it unnecessary to consume time or space in fortifying them with adjudged cases.

The complaint hereunder with reference to subdivision (b) relates to offered testimony by defendants with reference to the burglarizing of the store at Deatsville some time prior to the involved fatal occasion. It was offered to be proven that the store was not only broken into, but that certain articles of small value were taken therefrom, including some No. 12 shotgun shells similar to those found on the ground the next morning after the work of the mob. We think the court properly excluded that testimony. No testimony whatever in the entire record had a remote tendency to connect any of the Brownings with that burglary; but if it were otherwise it is then doubtful if it was competent. Certainly it was not admissible for the purposes of impeachment, and we can imagine no other effect that it would have. But it is argued in briefs that the entire brutal savagery that was perpetrated that night, including the death of Kate Browning, was the result of a brawl participated in only by the Brownings themselves, and that the offered testimony was, at least, competent in so far as it sought to prove the theft of gun shells of the same make found on the ground at the Browning hut the next morning.

But the trouble with that position, far-fetched though it be, is the total absence of any testimony in the record to support it. It is true that it was attempted to be proven that there had been some small differences among some of the Browning family, and which was attempted to be established by statements made by some of them to the witneses by which they were proven, but all of which was absolutely explained and shown to be of no consequence, and that even what did occur had been settled and all differences adjusted. Moreover, it was positively shown that the Brownings had no gun of any kind in their meager habitation, and it is almost preposterous to contend that they engaged themselves in such an imbroglio as to cause all of them to be shot, one killed, and their house burned. Each of them was severely cross-examined with a view of developing some such feud in order to account for the savagery perpetrated on that fatal night, and to prove that it was committed by others than the defendants, and who were most probably the Brownings themselves, but without avail.

Hence the only ground upon which the offered testimony could have been in any event even remotely competent falls to the ground.

The next instance of offered, but rejected, testimony related to the theft of a shotgun from a neighbor of the Brownings some days before the occasion in question, and its afterwards being found in a gully not far from their residence. The same want of relevancy applies to that tendered testimony. However, it did later get before the jury, and to disprove that the stolen gun was the weapon from which the found shells were fired the sheriff afterwards fired it, and its plunger made a distinctive mark on the shell, and it was thereby demonstrated that none of the found shells were fired by that gun. Objections to other questions propounded to witnesses by defendant's counsel were sustained, but whether the answers would have been material or not we are unable to tell, since there was no avowal as to what the witness would say. We therefore conclude that this ground is also without merit.

■ Ground (3) may also be divided into subdivision (c), misconduct of the commonwealth's attorney in his argument to the jury; (d), misconduct of the jury in separating from each other while considering the case, and misconduct of the sheriff in permitting such separation and in imparting information as to how the jury stood before finally reporting its verdict. Connected with this same ground it is also complained that the court was guilty of misconduct, and thereby erred in refusing to discharge the jury after it had reported more than once that it was unable to agree. Relative to subdivision (c) the record is somewhat confused as to what were the complained-of remarks of the commonwealth's attorney, since there appears a document in the record, called a "Bystander's Bill of Exceptions," which attributes to him somewhat different statements than what are contained in the bill of exceptions approved by the presiding judge. But, accepting the alleged bystander's bill as correct in this particular, we do not conclude that it furnishes grounds for reversal. Some of the many cases from this court dealing with the question and prescribing proper and improper limitations on such arguments are: Housman v. Commonwealth, 128 Ky. 818, 110 S. W. 236; Music v. Commonwealth, 186 Ky. 45, 215 S. W. 116; Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90; and

Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306. See, also, Roberson's Criminal Law (2d Ed.) sec. 1937.

The remarks here complained of were twofold: One was that the attorney said: "Do not pass this case up because the penalty is great, for it is a matter of common knowledge that because of weak-kneed Governors and pardon boards there is not a man in the penitentiary of this state today who has been there as long as ten years." We do not find from the bystander's bill what was the ruling of the court on the objections made to that statement, but in the one approved by the court it is stated that one of defendants' counsel whispered to the court at the time, that he objected to the argument, when the court in the same manner replied: "I was watching it; I don't think it is incompetent." But, accepting that as a sufficient exception we are then of the opinion that, although the remark may not have been altogether proper, it was not such an error as authorized a reversal, as was expressly so held in the Bolin case, supra, where the punishment was death, instead of life imprisonment. The remarks of prosecuting counsel in that case were substantially the same as those now under discussion and if they were not so erroneous as to authorize a reversal where the death penalty was inflicted, a fortiori would it be so when only imprisonment was inflicted, and we have so held in a number of such cases, both preceding and following the Bolin opinion. See Bailey v. Commonwealth, 193 Ky. 687, 236 S. W. 942; Chapell v. Commonwealth, 200 Ky. 429, 255 S. W. 90; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5, and the foreign cases of McNeill v. State, 102 Ala. 121, 48 A. S. R. 17, and State v. Shawen, 40 W. Va. 1, 20 S. E. 873. The jury was evidently not adversely influenced by the complained-of statement. On the contrary, it was disregarded by its returning imprisonment punishment instead of the death penalty, and the term of such imprisonment was the only one that could be affixed under a verdict of guilty, since no degree of homicide was submitted to it below that of murder. This complaint, therefore, is likewise without merit.

The other remarks complained of under this subdivision were: "They say the Brownings won't tell the truth, and bring a bunch of witnesses here to testify as to their bad reputation for truthfulness; but they told the truth about that still and have been here three times in this case; the court of inquiry, examining trial, and in

the present trial, and they have told the same story each time.'' The only possible vice that could be claimed as contained in those words was the reference to the former hearings before the court of inquiry and the examining trial. Those facts were brought out in the trial, and by counsel for defendants in their effort to lay grounds of impeachment, and the fact that there had been two prior investigations boldly appeared in the record, at least a portion of which was made by counsel for defendants, who had interrogated the Browning witnesses about their testimony at those two hearings. They were in the main unsuccessful in their efforts at impeachment, and under the circumstances we conclude that counsel was fully justified in making the remarks complained of in this subdivision (c).

The matter complained of under subdivision (d) of this ground, as presented by affidavits for defendants, was that the officer in charge of the jury took its members to a barber shop, where some of them and he were shaved. While he was in the barber's chair, some of the jurors were in the room, and others were around the door, but all were in sight of him. According to affidavits filed by the commonwealth, one of the jurors desired to retire to a toilet immediately at the rear of the shop, which was not far, and the sheriff accompanied him, but took and kept a position where he could see that place, as well as the other jurors, while other affidavits filed in support of this complaint by defendants alleged the contrary, and that the sheriff went out of sight of the other jurors. But, as just stated, his affidavit and those of all the jurors denied that fact, and all of them swore in that manner that no one spoke to them concerning the case throughout the entire visit to the shop, nor did they talk with each other about it.

In the case of Arnold v. Commonwealth, 194 Ky. 421, 240 S. W. 87, we held that the right of the defendant to require a jury to be kept together was statutory, and not constitutional, and that the statute would be given a liberal interpretation, so as not to defeat the ends of justice, and that, although there may have been a technical violation of the requirement, it would not produce a reversible error, if it be shown that the purpose of the requirement was fully protected through the absence of any attempted interference by others in an effort to bias any member of the jury against defendants. This question was also

dealt with under different facts in the cases of Wynn v. Commonwealth, 188 Ky. 557, 222 S. W. 955; Adkins v. Commonwealth, 197 Ky. 385, 247 S. W. 26; Caudill v. Commonwealth, 217 Ky. 403, 289 S. W. 371, and Shackelford v. Commonwealth, 185 Ky. 51, 214 S. W. 788. In some of them there was a more complete separation of the jury than the strongest affidavit of defendants would indicate in this case, and we held that, in the absence of a showing of some effort to unlawfully approach its members, the judgment of conviction would not be disturbed. We therefore conclude that the occasion complained of produced no reversible misconduct on the part of the jury, and for the same reason it did not create misconduct on the part of the sheriff.

But it is argued that the sheriff in some manner obtained information that the jury, before it reported its verdict, stood nine for conviction and three for acquittal, and that he imparted that information to others, whereby it became current and was later published in the newspapers of Louisville, Ky. The sheriff denied all that, and there was filed no affidavit of any reporter for any of the papers to show the source from which that information was obtained by him. Those having experience with jury trials know that such reports frequently obtained circulation, and that they are most generally based upon no more substantial foundation than mere surmise or guess. In view of the officer's denial, we coincide with the trial court in his finding that he was not instrumental in circulating that report. But, if he had been, then we are cited to no authority holding that it would be reversible error, unless, perhaps, he had obtained his information in a conversation with one or more of the jurors, and there was no evidence in this case pointing in the slightest degree that he so obtained it.

The complaint directed at the refusal of the court to discharge the jury after it had reported its failure to agree, and which occurred more than once, is equally unavailable for purposes of reversal. Mr. Roberson in his Criminal Law, supra, sec. 1945, says that the length of time that the jury may be held together to consider its verdict "must rest largely in the sound discretion of the trial judge" and that statement has frequently been approved by this court. Two of the cases in which it was so done are Chaplin v. Commonwealth, 142 Ky. 782, 135 S. W. 298, and Fowler v. Commonwealth, 195 Ky. 80,

241 S. W. 814. In the Chaplin case the issues were submitted to the jury on November 19, and it did not return a verdict until November 24, although it had in the meantime made several reports of its inability to agree. But we held, however, that the court did not abuse its sound discretion in keeping it together. The instant case was submitted to the jury on the late afternoon of June 5 and it returned its verdict in the early forenoon of June 7. It was kept together less than half the time that was done in the Chaplin case, and it is perfectly manifest that the court did not abuse a sound discretion in doing so. We therefore conclude that none of the matters complained of in this ground furnishes sufficient reason for reversing the judgment.

■ The last ground (4) relates to complaints with reference to the given instructions and to those not given, but which counsel insists should have been given. In support of the latter contention it is strenuously argued that it was the duty of the court to instruct the jury on all degrees of homicide under the doctrine announced in the cases of Rutherford v. Commonwealth, 13 Bush, 608, Bast v. Commonwealth, 124 Ky. 747, 99 S. W. 978, 30 Ky. Law Rep. 967, and others following them, to the effect that where the evidence is purely circumstantial, and no eyewitness testifies to the homicide (especially where the scene of its commission bears evidence of a struggle), it is the duty of the court to instruct on every degree of the offense, and which is upon the theory that under such circumstances the defendant should have the benefit of every doubt as to how it was committed and the manner of its commission, since in such cases there is no positive testimony relating thereto. But in this case there was positive testimony by eyewitnesses as to how and under what circumstances Kate Browning was shot.

In refutation of that statement it is argued that under the testimony of the prosecuting witnesses deceased may have received her fatal wound after all of them had left the scene, and which, though possible, is extremely improbable. It should, however, be remembered that defendants themselves testified in this case. They all denied their presence or participation in the commission of the crime, and of course, gave no testimony to reduce the crime if committed by them from murder to that of any lower degree. If this was a case where in all other respects the doctrine contended for would be applicable,

and defendants had remained off the witness stand, then this argument might be of some potency. But when they took the stand, and under oath gave no testimony upon which this insistence could possibly be based, it appears to us that it would not only be folly, but a travesty upon justice, to reverse their conviction of the only crime of which they are guilty if the prosecuting witnesses are to be believed. We are, therefore, unwilling to apply the rule contended for when defendant avails himself of his right to testify in the case in his own behalf and fails to establish by his testimony any ground for instructing on lower degrees of the offense charged; but which would be different if he failed to testify, and the facts were such as to call for the omitted instructions insisted on by defendants' counsel, in reliance on the line of cases referred to.

It is next insisted that the given instructions are erroneous, but with which we are unable to agree. The court gave to the jury instructions Nos. 1 to and including No. 8. They are somewhat lengthy and we will not insert them in this opinion. The first one followed the language of the indictment and authorized a conviction of all defendants who *actively* engaged in the perpetration of the murder, and of all those who did not so participate, if the jury believed beyond a reasonable doubt that they (those not actively participating) were present, aiding, assisting, and abetting those of the defendants, or the persons to the grand jury unknown, who did actually perpetrate it. The language to which the criticism of the instruction is chiefly directed is that following the general submission in appropriate language as above indicated, saying: "Then you will find the defendants, or any one or more of the defendants, guilty, whether the identity of the person who so shot and wounded Kate Browning is established or not."

It is contended that under that language the jury was authorized to convict all of the defendants, if it found from the evidence beyond a reasonable doubt that any one of them was present and aided and abetted any of the others, or any person to the grand jury unknown, who did actually engage in the shooting of deceased. A strained construction of the language might support that contention; but, when the instruction is considered in connection with instruction No. 7, there can be no room for any misunderstanding on the part of the jury, nor

any cause for it to be misled into erroneously convicting any of the defendants, because another one of their number aided and abetted some one else to commit the murder, when the convicted one or ones had no part in it. Instruction No. 7 says: "You may find all or any one or more of the defendants guilty, or you may find all or any one of them not guilty."

We must presume that the jury which is a part of the trial tribunal, and the members of which constitute the boasted protection of our liberty and are theoretically the peers of all defendants, were men of at least average intelligence. Reading together the two instructions referred to, which under numerous pronouncements from this court should be done, it is impossible to conclude that the jury was influenced to convict any of the defendants whom they believed were innocent through any misinterpretation of the language of instruction No. 1 so severely criticized by counsel. One of the latest cases relied on in support of this contention, and perhaps the strongest one, is that of Barrett v. Commonwealth, 215 Ky. 722, 286 S. W. 1047; but in that case there was no instruction corresponding to No. 7, supra, given by the court in this case, and the only reliance made by the commonwealth to overcome that error in the Barrett case was the reasonable doubt instruction which we held was insufficient for that purpose. If there had been an instruction in that case corresponding to No. 7 given in this case, then the opinion therein might justly be considered as authority for counsel's position.

It is next insisted under this ground that instruction No. 2 is erroneous, because it permits the jury to consider the proven acts and conduct of the defendant Kinder, and that of the two Hodges, together with the fact of one of the Crenshaws operating a still, to be considered by the jury as against the other defendants, *if* it believed from all the evidence in the case beyond a reasonable doubt, after excluding altogether such acts and conduct by those individual defendants, that a conspiracy existed, and, if so, then such acts and conduct might be considered as against the other defendants, who were not present when such individual acts and conduct were performed. That instruction appears to have been copied almost verbatim from the text of section 236 of Roberson's Criminal Law, supra, and we think it embodies a sound and correct principle of the criminal law.

It will be observed that defendants were neither indicted nor tried for entering into a conspiracy. They were only charged with murder, the language of which was in due form, and the essential element of it is "malice aforethought." The proof of a conspiracy is but a means of establishing such malice, which must be premeditated, and the conspiracy, if any, would be conclusive proof of such premeditation, and it was so held by us in the cases of Dorsey v. Commonwealth, 17 S. W. 183, 13 Ky. Law Rep. 359; Howard v. Commonwealth, 114 Ky. 372, 70 S. W. 1055; Day v. Commonwealth, 173 Ky. 276, 191 S. W. 105; Powers v. Commonwealth, 197 Ky. 160, 246 S. W. 436; and which was also in effect, approved in the case of Watts v. Commonwealth, 197 Ky. 105, 245 S. W. 884. This court, in its opinion in the last-cited case, pointed out some prior conflicting ones of an earlier date on the question as to whether testimony of a conspiracy in a criminal trial should be admitted, when it was not so charged in the indictment, and after recognizing such conflict between our earlier and later opinions, we said: "It is sufficient to say that when a defendant is jointly indicted with others for murder, it is nòt going far afield to prove that he and his codefendants agreed in advance to do the very thing charged in the indictment and to submit such agreement to the jury."

The soundness of that statement cannot be questioned, and to apply it as a rule of practice cannot in the slightest degree prejudice the right of defendant, since, as we have pointed out, the testimony is but a method of proving the necessary element to establish the required malice for the commission of the charged offense. But our opinions, supra, do not stand alone upon that question, since other courts coincide therewith, as will be seen from a consultation of the following cases: Goins v. State, 46 Ohio St. 457, 21 N. E. 479; People v. McKane, 143 N. Y. 455, 38 N. E. 954; State v. Ruck, 194 Mo. 416, 92 S. W. 706, 5 Ann. Cas. 976; Gill v. State, 59 Ark. 430, 27 S. W. 598; State v. Kennedy, 177 Mo. 118, 75 S. W. 979; and others contained in the annotations to the case of State v. Ruck, reported in 5 Ann. Cas. 984, and which annotations approve the rule above stated and cite some of our cases, supra, in support thereof. To the same effect is the text in Roscoe's Criminal Evidence (8th Ed.) p. 575, and Wharton's Criminal Evidence (8th Ed.) p. 563, sec. 700.

We refrain from inserting excerpts from the cited authorities, since this opinion is already too long; but the reader, upon consulting them, will find that they are in direct conflict with the criticism now under consideration, and with some of our earlier cases, which hold that evidence of a conspiracy is incompetent, if there is no such charge in the indictment. The court said, in the criticized instruction No. 2, that, unless the jury believed from the evidence beyond a reasonable doubt that there was such a conspiracy, then the matters relating to the individual defendants could not be considered against any of the others "for any purpose whatever," and all of which we think conforms strictly to the correct practice.

But it is further insisted that the evidence with reference to the conversation with the Hodges, as well as the instruction limiting its effect, as hereinbefore referred to, was erroneous, because it occurred after the purpose of the conspiracy, if any, had been accomplished. The instruction authorized the jury to consider it as against the other defendants, only if it found from the evidence that the conspiracy existed at *that* time and if those defendants were *then* engaged in carrying it out. As we have hereinbefore shown, that conversation occurred very shortly after the unfortunate victims had left the scene of terror, and shooting was still going on. The jury had the right to conclude that the purpose of the conspiracy had not then ended, but was still being prosecuted, and the instruction told them that, unless they so believed, they would not consider that evidence as against any of the defendants, except the Hodges. Surely, in the light of the testimony and under the conditions of that submission the jury was not misled, nor the defendants prejudiced by that instruction.

But it is said that in no event was this or any other instruction with reference to conspiracy proper, because there was no evidence in the record from which the existence of a conspiracy could be predicated; but counsel is clearly in error in making this contention. Conspiracies from their very nature are most generally incapable of proof by direct testimony; hence the courts throughout the country permit the prosecution to take a wide range, and to establish the conspiracy, if possible, by circumstances corresponding to links in chains, and from all of which the jury are authorized to infer that a conspiracy

existed. Some of the many cases in this court supporting that statement are, Gambrell v. Commonwealth, 130 Ky. 513, 113 S. W. 476; Daniel v. Commonwealth, 154 Ky. 601, 157 S. W. 1127, Morgan v. Commonwealth, 188 Ky. 458, 222 S. W. 940, and Welch v. Commonwealth, 189 Ky. 579, 225 S. W. 470. We have in this case a number of circumstances forming the links in the chain, independently of the fact of the midnight gathering at which, according to the witnesses for the commonwealth, defendants were present and the depredations were committed.

In the cases of Anderson v. Commonwealth, 144 Ky. 215, 137 S. W. 1063, and Napier v. Commonwealth, 110 S. W. 842, 33 Ky. Law Rep. 635, we held that the assembling of such a mob at such an hour, followed by criminal acts indicative of an execution of their purpose, was itself sufficient to submit the issue of a conspiracy to the jury and to support its finding that one existed. The facts in the two latter cases, especially the Anderson case, were so similar to those in this one as to render them practically identical. The same contention was made in each of them, and in answering it in the Anderson case, we said: "It is true there is no evidence of any conspiracy beyond the fact that this band of men were together at the Carroll home at the time; but evidence that a band of men assembled together at such a time and place as these men were is of itself sufficient evidence that their assembling was pursuant to an agreement or understanding previously entered into. It would be folly to say that a band of armed and disguised men, assembled by accident at the time and place these men did. That their meeting was the result of concert and conspiracy there can be no doubt." Practically the same language was employed in the Napier opinion, and which completely demonstrates the fallacy of this contention. There are other criticisms made to the instructions, but which we think we have already answered, in so far as they are of the slightest materiality, and we will not lengthen this opinion with a seriatim discussion thereof.

In conclusion, we deem it proper to say that this crime, as has been hereinbefore intimated, is one that staggers credulity. It is inconceivable that in this day of civilized enlightenment people could be found who for a moment would entertain, much less undertake to execute, the thought of engaging in such savagery as this

record portrays, but which the testimony in this record strongly supports the conclusion *was* entertained and partly executed by the appealing defendants, who attempt to overthrow all the guilty evidence against them with their weak alibis, and by proving the pitiable standing in the community of their victims.

We have concluded, from a painstaking study of this record, that defendants have had a fair trial, and that the record discloses no error prejudicial to their substantial rights, and the judgment is affirmed.

The whole court sitting.