## McMillan v. Commonwealth.

(Decided March 12, 1935.)

J. D. TUGGLE and J. J. TYE for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Under an indictment charging him with the offense defined by section 1358a of the Kentucky Statutes, the appellant was tried and convicted, and, from a judgment sentencing him to one year in the state penitentiary, he appeals. The indictment charged that he converted to his own use $800 in money, the property of J. G. Rader.

McMillan for a number of years had been doing business as the Cumberland Canning Company, with his place of business at Barbourville, Knox county. He was also a dealer in canned goods.

The evidence for the commonwealth shows that on or about November 1, 1932, he went to Roanoke, Va., and requested F. H. Gregory, treasurer of the American Brokerage Company, which was engaged in the merchandise brokerage business, to locate for him two cars of canned tomatoes. Gregory agreed to and did locate two cars of tomatoes, one car to contain 1,200 cases of No. 2's and one to contain 600 cases of No. 2's and 500 cases of No. 2½'s. The 2's were sold to McMillan at 52½ cents a dozen cans and the 2½'s at 80 cents a dozen cans. In the car containing 1,200 cases, 1,000 cases belonged to J. G. Rader and 200 cases to C. W. Firestone, who were the growers and canners. The cars were shipped to McMillan, and he was sent bills of lading with drafts attached. The amount of the draft for the tomatoes belonging to Rader and Firestone was $1,241.10. The two cars were shipped from Nace, Va., on or about November 12 and reached Corbin, Ky., where McMillan had a warehouse on November 16. On November 22 McMillan wired Gregory that he was having complaints about the quality of the tomatoes and that he would call him at 10 o'clock on Wednesday. McMillan did telephone to Gregory on the following Wednesday, and during the conversation he rejected

the two cars of tomatoes on account of their quality. Gregory arranged with him to have the two cars unloaded and the tomatoes stored in McMillan's warehouse until they could be disposed of. The bank at Barbourville was directed to deliver to McMillan the bills of lading without payment of the drafts. Gregory also authorized McMillan to sell the tomatoes to the best advantage possible and to remit the proceeds to the owners. According to Gregory, the contract of sale to McMillan was canceled, and McMillan received the tomatoes on consignment to sell for the owners as their agent. Correspondence between McMillan and Gregory corroborates Gregory in his version of the agreement.

Gregory wrote, wired, and telephoned to McMillan from time to time seeking information as to what disposition he was making of the tomatoes, but received little satisfaction. McMillan finally ceased answering Gregory's letters and telegrams, and on December 28 Gregory, R. R. Rader, son of J. G. Rader, owner of 1,000 cases of the tomatoes, and C. T. Layman, owner of 600 cases of the tomatoes, went to Barbourville, Ky., to see McMillan. They telephoned to his home, and his wife reported that he was sick in bed. They went to his home, but were unable to obtain any definite information concerning the disposition he had made of the tomatoes. He told them that he had sold them to some coal companies around Corbin, Ky., but had not been paid for all of them. He refused to divulge the names of the purchasers. They then went to Corbin, Ky., and learned that the two cars had been diverted upon their arrival at Corbin to Cincinnati, Ohio. They returned to Barbourville and confronted McMillan with the information they had obtained, and he finally admitted that he had diverted the cars to Covington, Ky., but still refused to give the names of the purchasers. Gregory, Rader, and Layman returned to their homes in Virginia, and on January 3, 1933, accompanied by C. W. Firestone, owner of 200 cases of the tomatoes, they returned to Barbourville and met McMillan at the hotel. McMillan still refused to disclose the names of the purchasers of the tomatoes or to account for the proceeds. A later investigation disclosed that the tomatoes had been shipped to Cincinnati and stored in a Cincinnati tobacco warehouse. At the direction of McMillan they were sold by Mr. Nicholas J. Jansen, a

commission merchant of Cincinnati, who sent McMillan a check for $1,688.76, payable to The Cumberland Canning Company. The check was indorsed by the Cumberland Canning Company, and the proceeds of the check were placed to the credit of Mrs. R. H. McMillan on the 2d day of January, 1933, in the First State Bank of Barbourville. Practically all of the money was checked out of the bank by McMillan and his wife prior to January 20, 1933.

McMillan testified that he purchased the tomatoes through Gregory and that the contract was never altered. It is his contention that he is merely a creditor of Rader and the other owners of the tomatoes and is still indebted to them. The overwhelming weight of the evidence, however, supported the commonwealth's contention that at the time the tomatoes were sold and the proceeds received by McMillan he was acting as the agent of the owners.

Appellant complains of certain evidence admitted over his objection. Most of it consists of statements made by R. R. Rader and F. H. Gregory on the witness stand as to information obtained by them on the trip to Corbin concerning the diversion of the two cars of tomatoes to Cincinnati. Some of the evidence objected to was hearsay, but it was merely cumulative and was not prejudicial. The same facts were proved by competent testimony, and appellant admitted that the shipment had been diverted. The fact of diversion was really not material. Whether appellant was the purchaser of the tomatoes, as claimed by him, or was acting as the agent of Rader, as claimed by the commonwealth, he could exercise his own discretion as to the time, manner, and place of selling them. If McMillan delivered and sold the tomatoes as Rader's agent, he was guilty of the offense charged in the indictment if he converted the proceeds to his own use. These were the only issues in the case.

It is insisted that the evidence fails to show that the tomatoes in the car in question belonged to J. G. Rader, but that it does show the car contained only tomatoes belonging to R. R. Rader and C. W. Firestone. R. R. Rader is the son of J. G. Rader, and he testified that his father was unable to be present on account of illness. The question of ownership was not fully developed, but the record discloses that the car contained

1,200 cases of tomatoes and that 200 cases belonged to C. W. Firestone and 1,000 cases were shipped in the name of J. G. Rader. R. R. Rader, in his testimony, sometimes referred to the shipment as "our property" or "my property," but it is clear that he was representing his father in the transaction and that the latter was at least a part owner of the property. An indictment under section 1358a of the Statutes charging one with the crime of fraudulently converting to his own use money or other property of another of the value of more than $20 is sufficient to warrant a conviction, even though it may develop that the property belonged to the person named in the indictment and to others jointly. Commonwealth v. Bain, 240 Ky. 611, 42 S. W. (2d) 876.

The indictment charged that the conversion occurred in Knox county, and, because the evidence fails to show that the cars containing the tomatoes were ever in Knox county, it is argued that the Knox circuit court was without jurisdiction. A complete answer to this argument is that the indictment charged the accused with converting to his own use money, the property of J. G. Rader, and the evidence shows that the money was deposited in the First State Bank of Barbourville and then converted by appellant to his own use.

The instructions were criticized because, as claimed by appellant, they are confusing and misleading, but we think they presented the only issues in the case with sufficient clarity to enable the jury intelligently to consider and determine the question of appellant's guilt.

The case was submitted to the jury at 7 o'clock in the evening, and it deliberated until 9 o'clock, and then reported to the court it could not agree. On the next morning it was sent to its room for further deliberation, and once or twice during the day reported that it was unable to agree, but on each occasion it was sent back to its room for further deliberation. It is argued that the verdict was not reached after a free and fair deliberation of the jury but was obtained by the coercion of the trial judge. Section 251 of the Criminal Code of Practice provides that the court may discharge the jury if, after being kept together such a length of time as the court deems proper, they do not agree on a verdict and it satisfactorily appears that there is no probabil-

ity they can agree. Discretion in the matter is vested in the trial judge.

In Canterberry v. Commonwealth, 222 Ky. 510, 1 S. W. (2d) 976, 977, a capital case, the trial judge threatened to keep the jury together for ten days when they reported that they were unable to agree. This was held to be prejudicially erroneous. The court said:

"While the Code (Cr. Code Prac. sec. 251) gives to the circuit judge a reasonable discretion as to the time the jury may be held together for the purpose of arriving at a verdict, and the court may properly admonish them as to their duty and the importance of reaching an amicable conclusion, he is not authorized to do this arbitrarily, or to do or to say anything to coerce their action. Sandefur v. Com., 143 Ky. 655, 137 S. W. 504; Randolph v. Lampkin, 90 Ky. 551, 14 S. W. 538 [12 Ky. Law Rep. 517] 10 L. R. A. 87; Chaplin v. Com., 142 Ky. 782, 135 S. W. 298; People v. Sheldon, 156 N. Y. 268, 50 N. E. 840, 41 L. R. A. 644, 66 Am. St. Rep. 564. In capital cases the jurors are placed under guard, and in a sense kept in confinement, and a threat by the trial judge to prolong such confinement for a period of ten days is calculated to coerce and control a weak and timorous juror."

The present case presents an entirely different situation. On each occasion when the jury reported its inability to agree the circuit judge, without comment, merely directed its members to return to the jury room for further deliberation. Most of the witnesses for the commonwealth resided in other states, and, in the circumstances, it would not have been an abuse of discretion if the trial judge had admonished the jury as to the importance of reaching an agreement so long as he did not indicate in any way his opinion as to what verdict should be rendered. Grubbs v. Commonwealth, 240 Ky. 473, 42 S. W. (2d) 702; Miller v. Commonwealth, 240 Ky. 355, 42 S. W. (2d) 523; Fowler v. Commonwealth, 195 Ky. 80, 241 S. W. 814.

The verdict was returned within 24 hours after the case was submitted to the jury. In Crenshaw v. Commonwealth, 227 Ky. 223, 12 S. W. (2d) 336, the jury reported several times that it was unable to agree, but it was held that the trial court did not abuse its sound discretion in keeping the jury together from the late after-

noon of June 5 until it returned its verdict in the early forenoon of June 7. In Chaplin v. Commonwealth, 142 Ky. 782, 135 S. W. 298, it was held that it was not an abuse of discretion to keep the jury together from November 19 until it returned a verdict on November 24.

In each of these cases it was said that the length of time that the jury may be held together to consider its verdict rests largely in the sound discretion of the trial judge. To the same effect are Fowler v. Commonwealth, supra, and Gilbert v. Commonwealth, 51 S. W. 590, 21 Ky. Law Rep. 415.

In the instant case it is manifest that the trial judge did not abuse a sound discretion in keeping the jury together until it reached a verdict.

Finding no error prejudicial to appellant's substantial rights, the judgment is affirmed.