## Whitfield v. Commonwealth.
(Decided Oct. 20, 1936.)

BLAKELY & MURPHY for appellant.

B. M. VINCENT, Attorney General, and J. J. LEARY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

David Whitfield, Sidney Diehm, and Edward Sanford Garrison were jointly indicted for the crime of willful murder, committed by setting on fire a house and burning to death Mary Lou Rardin, an infant. Diehm entered a plea of guilty. The jury fixed his punishment at confinement in the State Reformatory for life. Garrison, on a plea of not guilty, was convicted by the jury and given the same. Later, Whitfield on a trial before a jury was given the same. Whitfield is appealing, insisting the evidence is insufficient to sustain the verdict of the jury, the court admitted incompetent evidence and erroneously instructed the jury.

Whitfield was engaged in conducting a saloon at Newport, Ky., with a license to sell beer and soft drinks. Diehm and Garrison were his associates and customers. Garrison lived at a boarding house situated near Whitfield's place of business. Diehm's residence is not identified by the evidence. Peter Schmidt conducted the Glenn Hotel about opposite Whitfield's place of business. His mother and other members of her family owned a place on the Alexandria Turnpike. It was in charge of the son, Peter Schmidt. He kept there, livestock, horses, mules, and milch cows. He employed Carl J. Fillhardt to live in the second story of the residence, do the garden work and care for the livestock and milk the cows. Fillhardt with his wife and Mary Lou Rardin occupied and used four rooms on the second floor. In connection with this residence, Peter Schmidt used for his exclusive, private purposes a portion of this residence; Fillhardt had no access to that portion of it. Just exactly what it was used for is not disclosed by the evidence. There was a furnace in the cellar of the residence. On the evening before the child was burned to death, Fillhardt and his wife, with it, left home about 5 o'clock p. m. to visit relatives. About 1 o'clock a. m. that night, they returned, and as he drove his car into the garage an automobile pulled up to the garage. There were two men on the front seat and "a man looking out the side of the back." This machine was a Chevrolet or a Plymouth. As it pulled up to the garage Mrs. Fillhardt stepped to the garage door, then the car turned around at a lane that went into a pasture just at the top of a hill. There it turned around and went back down the hill. It was a closed car. She and her husband and the child went into their home, she prepared for bed and her husband went down in the basement to look after the furnace. After she retired and had gone to sleep, she was awakened by the sound of breaking glass. She called to her husband, and after shaking him, he awoke. She heard the dining room door crash, and at the same time heard voices in their kitchen. She turned on the electric light, and about the time she did so an explosion occurred downstairs. The door to their room flew open, knocking the husband back. He pushed the screen out of the window and helped his wife through it to the ground. When she looked up to the room which she had left, it was filled with fire. The husband, on account of the fire, was unable to see the infant in its bed. He

grabbed it and dropped it out of the window onto a bank of snow which had been piled up by the side of the house; then he jumped out of the window. Fillhardt testified that his wife closed up, and he locked, the downstairs before he went upstairs. As soon as his wife woke him he went to the window and looked out. ''A machine was setting there and a man walking into the house,'' when he heard quite a bit of noise. ''A man came out of the house, carrying something in front of him and put it in the machine.'' He returned from the machine directly to the house and knocked on the door when he (Fillhardt) heard a voice saying: ''Did you get the door open?'' He heard something pounding in the sink or on a porcelain table downstairs; a man started up the stairway and came up about four steps, when Mrs. Fillhardt turned the light on. The man ran back down the steps and about the time he reached the bottom an explosion occurred. He recognized and positively identified Diehm and Garrison. The fire immediately followed the explosion. The automobile was parked at a point that led up to the pasture gate in sight of the window through which Fillhardt escaped. It was a light night and snow was on the ground. About the time Fillhardt reached the ground Diehm reached the automobile, and while driving it away he was looking back at Fillhardt. While so operating it, it ran into a post, knocking it down, and, of course, momentarily stopping the automobile. Although Fillhardt sprained one ankle and broke the other in his jump from the window, he chased after the man in the automobile about 15 feet when he fell. His neck, face, hands, and arms up to his elbows were burned while he was getting the child out of the bed. He saw Garrison going down the stairs right opposite which the automobile was parked. A few moments after the child was dropped on the pile of snow it was taken to the hospital, where it remained until it died shortly afterward.

On the night of the fire Whitfield was at his place of business. Diehm and Garrison were there, and the three drank beer. Whitfield left his place of business about 10:30 or between 10 and 11 o'clock; went to the place of business of Dave Leften and inquired of Leften if he had in stock 5-gallon cans. He purchased three of them at the price of 15 cents each. He stated to Leften: ''He wanted them, three 5-gallon cans to get gasoline to take it out in the country.'' He left with them in a ma-

chine. The cans were square, encased in corrugated pasteboard jackets. James M. Wood, a probation officer of the county, after the fire, was at Peter Schmidt's place on the Alexandria Pike and in company with detectives made a thorough search of the ruins of the fire. They found a 5-gallon can about three or four feet from a pile of coal in the basement. It was face down, under stones and debris. About two-thirds of it was covered up. It was examined and identified by him while testifying. The Fillhardts used a gasoline stove at their home for cooking purposes. The gasoline for immediate use was in a glass jug. Fillhardt testified that the can which Wood identified was not at his home before the fire; that he did not own or use it or one like it. About the time the explosion occurred, Mr. and Mrs. Hurd were on the highway traveling in an automobile when they observed the fire, stopped and witnessed it for a few moments. They testified that the fire was burning brightly and Mrs. Hurd testified that she saw three men running from the fire to an automobile. One count of the indictment charged the three as principals, and another with aiding and abetting, "but that which one of them so actually set fire to said building * * * and which one of them so actually counseled, advised, aided and abetted therein, was to the Grand Jury unknown." It should be noted that the indictment does not charge conspiracy. Whitfield's defense was an alibi. The testimony discloses three men in the act of running to the automobile. Leften's testimony, together with the testimony of Wood and the Fillhardts concerning the 5-gallon can, very strongly tends to connect Whitfield with the commission of the crime. But we are not prepared to say that altogether it is sufficient to identify Whitfield as one of the men present and described by Mrs. Hurd and the Fillhardts.

Shortly after the fire Whitfield admits that from Covington he called a doctor to attend Garrison. They secured the services of Dr. Edward J. Nestley. Whitfield and Garrison thereupon appeared at the office of Dr. Nestley. Garrison was suffering with gasoline burns on both legs and on the right wrist. The doctor treated him, for which Whitfield paid him $10. In giving, in the presence of Whitfield, the history of his burns to the doctor, he said he had sustained them in an automobile accident. William Sauerbrey resided at 525 Riverside drive, Newport. Whitfield, with Garrison, about 4:15 a.

m. that morning appeared at the home of Sauerbrey. Whitfield informed him he "had had a man burned and asked Sauerbrey if he would keep him and take care of him," and that "the doctor would come and treat him and take care of him." Sauerbrey asked Whitfield "if that man was in Pete Schmidt's fire." Whitfield said "No." Then Whitfield took Garrison through the basement up into the attic. Thereafter, he returned three or four times, every time in the night, to the home of Sauerbrey to see Garrison. Dr. Nestley also made three trips to see Garrison. Later Sauerbrey talked with Whitfield about his taking Garrison away, and he said he would take him out that night or would come back a little later and take him out. Sauerbrey again asked Whitfield about Garrison being up at Pete Schmidt's fire and being burned. Whitfield's response was, "He was not in the fire, a still blew up, the gasoline burner blew up." Whitfield had a prescription filled at a drug store for Garrison. The prescription was given by Dr. Nestley, showing that it was for the use of Sauerbrey. The sheriff arrested Garrison at the home of Sauerbrey the night Whitfield had agreed to return and take him away. Garrison admitted to the sheriff that he had burned Pete Schmidt's place and stated that it was the first time he had ever burned a child or killed a baby, and said he could not sleep.

On the night of the fire Diehm and Garrison left Whitfield's place of business between 11:15 and 11:30. In about an hour and fifteen minutes Diehm returned to Whitfield's place of business and asked for a towel. At that time his face was bruised and dirty. An employee of Whitfield dipped a towel in ice water, handed it to Diehm, and he applied it to his face. He remained there for a half to three-quarters of an hour. Whitfield returned to his place of business about 2:30 and remained about an hour and a half or two hours, or until about 4 or 4:30.

The evidence shows that Diehm owned an automobile and that Whitfield had one in his possession that night at Leften's place. The testimony of Peter Schmidt establishes that he and Whitfield were not friendly. Whitfield asserted they were good friends and that he had frequented Schmidt's hotel up near to the time of the fire. Without reciting the testimony tending to establish the state of feelings of Whitfield and Schmidt, it is sufficient to say that if the jury believed Schmidt,

Whitfield's feelings toward him were very bitter. If that of Whitfield is accepted, they were on friendly terms. Undoubtedly, the testimony of Schmidt tending to establish ill feelings of Whitfield toward him was competent. Hilger v. Commonwealth, 254 Ky. 117, 71 S. W. (2d) 9.

The court in permitting him to narrate occurrences tending to establish Whitfield's feelings toward him allowed him to detail difficulties which he claimed he had had with Whitfield. Whitfield objected to the detailment of the occurrences between them. It is true that Schmidt narrated them at great length over the objections of Whitfield, but this fact does not render them incompetent. There is no evidence tending to show even an acquaintance of Diehm and Garrison with Peter Schmidt, much less evidence that they had any ill feelings toward him or any motive for setting fire to and burning his property. The feelings of Whitfield, as established by the testimony of Schmidt, tend to show a motive on his part to set fire to and burn Schmidt's property. Whitfield objected to the testimony of the witness describing the burns on Garrison's legs; also, to his statements to the sheriff at the time of his arrest. This line of testimony tended to show Garrison's connection with the commission of the crime and corroborated Fillhardt's identification of him at the time of the fire. He also objected to the statement of the witness describing Diehm's face on his return to Whitfield's place of business. For like reason this evidence was competent to identify Diehm as one of the perpetrators of the crime, as well as to corroborate Fillhardt's identification of him at the time of the fire. The court properly overruled Whitfield's objection to this line of testimony. Respecting the statement of Garrison to the sheriff, the court admonished the jury thus:

"The jury are instructed that they shall not consider this testimony of the witness Howe with reference to this statement and condition of Edwin Sanford Garrison for any purpose in this case as against the defendant, David Whitfield, but you may consider the same as evidence to show or tending to show, if in your judgment it does so show, the identity with or motive for the commission of the crime as charged in the indictment by the defendant Garrison himself."

This admonition, except as it refers to motive, was entirely proper, and had Whitfield requested it, it would have been proper for the court to have given the same admonition respecting the witness' statement concerning Diehm's face when he returned to Whitfield's place of business. It is true that the court permitted Schmidt to detail elaborately the occurrences between him and Whitfield. Whitfield objected to the elaboration. It is manifest that the jury knew that the admission of this line of testimony was for the purpose of showing a motive, if any it did show, on the part of Whitfield to burn Schmidt's property, and that he was not being tried for the occurrences described in his testimony. A Mr. Maloney had boarded at the hotel of Schmidt and had resided there a year or two. He was in possession of plenty money. He furnished Whitfield money with which to prepare his place for business, and to equip it. This fact was known to Schmidt, and Schmidt desired to avail himself of Maloney's money to prepare a place of business for himself, which fact was known to Whitfield. The effect of the testimony with reference to Maloney was to show a state of jealousy between them on account of his money. This evidence was competent, as it tended to show the state of Whitfield's feelings toward Schmidt and a motive on his part to burn the property. Schmidt was permitted to detail at length his relations to Maloney and his money. It should be admitted that if jealousy existed between them on account of Maloney and his money, it was competent to show the feelings between them arising therefrom, and elaboration of Schmidt's statements in describing their relations did not render it incompetent. It is true that motive on the part of Whitfield was not sufficient to authorize the submission of the case to the jury, and the evidence failing to identify him, unequivocally as one of those present at the time of the commission of the crime, or near enough to it, to aid, abet, assist, encourage, counsel, and advise them to commit it, the court improperly instructed the jury to find him guilty, as an aider and abettor. Shelton v. Commonwealth, 261 Ky. 18, 86 S. W. (2d) 1054. We do not mean that on the proven facts Whitfield was entitled to a peremptory instruction. The evidence adequately establishes a conspiracy on the part of Diehm, Garrison, and Whitfield to burn the property of Peter Schmidt to require the case to be submitted to the jury. This conclusion is not

arrived at solely from the evidence showing that they associated at Whitfield's saloon. If there were three men present and running away from the fire toward the automobile as described by Mrs. Hurd, plainly they were the same men who drove an automobile up to the garage with two men in the front seat and a man looking out of the side of the back as described by Mrs. Fillhardt. These facts show that they were acting in concert in the sense of a criminal conspiracy. It is for a jury under the guidance of appropriate instructions to decide on the whole of the evidence whether a conspiracy existed, and the crime was committed in pursuance of it. Crenshaw v. Com., 227 Ky. 223, 12 S. W. (2d) 336. The joint actions of Whitfield and Garrison after the fire corroborate the theory that a conspiracy existed between them to commit a crime. Whitfield, Garrison, Sauerbrey and Schmidt are not without courthouse experience. They are not novices in the commission of crime. Each of them had been previously convicted of a felony and confined in the penitentiary; Garrison, Sauerbrey, and Schmidt for violating the National Prohibition Law (41 Stat. 305), and Whitfield for embezzlement, robbery, and violation of the National Prohibition Law. Whitfield's explanation of his association with Garrison after the commission of the crime is that it was his belief that Garrison had been burned by the exploding of a container of gasoline at a moonshine still, and that he was afraid to disclose Garrison's whereabouts and his condition after he learned that the child had been burned and died from the effects of the burns, because Garrison was on probation and a disclosure might cause his arrest and confinement under his conviction for violating the National Prohibition Law. It is just as reasonable to conclude, and more so if he had participated in the commission of the crime or entered into a conspiracy to commit it, that he was secreting Garrison and keeping to himself and his doctor and friend, Sauerbrey, all information as to Garrison being burned, to prevent a discovery of Garrison's connection with the crime of burning the Schmidt property, and if he were one of the three men seen at the place of the fire, it is a reasonable presumption that he failed to disclose Garrison's condition and whereabouts and his association with him after the property burned to prevent a discovery of his and Garrison's joint connection with the crime of burning the Schmidt property. The court

should have omitted the instruction on aiding and abetting and given an instruction on conspiracy as was done in Ray v. Com., 230 Ky. 656, 20 S. W. (2d) 484, 66 A. L. R. 1297; Jeffries v. Com., 255 Ky. 365, 74 S. W. (2d) 203.

There was no evidence on which to predicate instruction No. 4, and the court will omit this instruction on another trial.

Wherefore the judgment is reversed, and cause remanded for proceedings consistent with this opinion.